BLUE SHIELD OF VIRGINIA ET AL. *v.* McCREADY

No. 81–225.  Argued March 24, 1982—Decided June 21, 1982

466

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post*, p. 485. STEVENS, J., filed a dissenting opinion, *post*, p. 492.

*Griffin B. Bell* argued the cause for petitioners. With him on the briefs were *James D. Miller, William B. Poff, Ronald M. Ayers, Heman A. Marshall III, Joel I. Klein,* and *H. Bartow Farr III.*

*Warwick R. Furr II* argued the cause for respondent. With him on the brief were *Timothy J. Bloomfield* and *Thomas M. Brownell.**

JUSTICE BRENNAN delivered the opinion of the Court.

The antitrust complaint at issue in this case alleges that a group health plan's practice of refusing to reimburse subscribers for psychotherapy performed by psychologists, while providing reimbursement for comparable treatment by psychiatrists, was in furtherance of an unlawful conspiracy to restrain competition in the psychotherapy market. The question presented is whether a subscriber who employed the services of a psychologist has standing to maintain an action under § 4 of the Clayton Act based upon the plan's failure to provide reimbursement for the costs of that treatment.

I

From September 1975 until January 1978, respondent Carol McCready was an employee of Prince William County,

---

*\*Paul R. Friedman, Bruce J. Ennis,* and *Donald N. Bersoff* filed a brief for the American Psychological Association as *amicus curiae* urging affirmance.

Va. As part of her compensation, the county provided her with coverage under a prepaid group health plan purchased from petitioner Blue Shield of Virginia (Blue Shield).[1] The plan specifically provided reimbursement for a portion of the cost incurred by subscribers with respect to outpatient treatment for mental and nervous disorders, including psychotherapy. Pursuant to this provision, Blue Shield reimbursed subscribers for psychotherapy provided by *psychiatrists*. But Blue Shield did not provide reimbursement for the services of *psychologists* unless the treatment was supervised by and billed through a physician.[2] While a subscriber to the plan, McCready was treated by a clinical psychologist. She submitted claims to Blue Shield for the costs of that treatment, but those claims were routinely denied because they had not been billed through a physician.[3]

In 1978, McCready brought this class action in the United States District Court for the Eastern District of Virginia, on behalf of all Blue Shield subscribers who had incurred costs

---

[1] With petitioner Blue Shield of Southwestern Virginia.

[2] Petitioners contend that the contract between the county and Blue Shield must be read to bar payments for the services of nonphysicians. Respondent counters that between 1962 and 1972 Blue Shield routinely reimbursed subscribers for psychotherapy provided by psychologists, and that this practice was revised in 1972 as a result of the alleged conspiracy. In addition, respondent notes that in 1973 the Virginia Legislature passed a "freedom of choice" statute, Va. Code § 38.1–824 (1981), that required Blue Shield to pay for services rendered by licensed psychologists. See *Virginia Academy of Clinical Psychologists* v. *Blue Shield of Virginia*, 624 F. 2d 476, 478 (CA4 1980). She argues that Blue Shield's obligations must be read consistently with that statute, at least until that statute was held invalid as applied in *Blue Cross of Virginia* v. *Commonwealth*, 221 Va. 349, 269 S. E. 2d 827 (1980). This case arises on a motion to dismiss. We therefore assume, as McCready has alleged, that but for the alleged conspiracy to deny payment, she would have been reimbursed by Blue Shield for the cost of her psychologist's services.

[3] Apparently Blue Shield inadvertently paid one of McCready's claims. After the error was discovered, Blue Shield sought to obtain a refund from McCready for the amount paid. 649 F. 2d 228, 230, n. 4 (1981).

for psychological services since 1973 but who had not been reimbursed.[4] The complaint alleged that Blue Shield and petitioner Neuropsychiatric Society of Virginia, Inc., had engaged in an unlawful conspiracy in violation of § 1 of the

[4] A similar complaint was filed by the Virginia Academy of Clinical Psychologists (VACP) and its president against the same defendants. The District Court addressed the motions to dismiss filed in each of the cases in a single opinion. The court dismissed McCready's case—thus giving rise to the appellate decision at issue in this Court—but permitted the VACP case to proceed to trial. Following trial, the District Court entered judgment for the defendants, Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 469 F. Supp. 552 (1979), but the Court of Appeals reversed with respect to defendant Blue Shield, 624 F. 2d 476 (CA4 1980). The opinion of the Court of Appeals for the Fourth Circuit in the instant case states that the opinion in VACP "should be read in connection with" its own opinion. 649 F. 2d, at 230. A brief recitation of the decision in the VACP case is thus helpful in understanding the precise nature of McCready's claim.

In VACP, the Court of Appeals rejected the District Court's treatment of Blue Shield as a distinct entity for purposes of determining whether a conspiracy or agreement had been shown. 624 F. 2d, at 479. The court found that "the Blue Shield Plans are combinations of physicians, operating under the direction and control of their physician members." Ibid.

"Blue Shield Plans are not insurance companies, though they are, to a degree, insurers. Rather, they are generally characterized as prepaid health care plans, quantity purchasers of health care services. [I]n a real and legal sense, the Blue Shield Plans are agents of their member physicians." Id., at 480 (citations and footnote omitted).

With respect to the question whether the alleged Blue Shield combination was "in restraint of trade," the Court of Appeals agreed with the District Court that the rule of reason was applicable, but held that the District Court had erred in finding no liability. The Court of Appeals observed that psychologists and psychiatrists compete in the psychotherapy market, and that the decisions of Blue Shield "necessarily dictate, to some extent," who will be chosen to provide psychotherapy. Id., at 485. Finding that Blue Shield's policy of denying reimbursement for the psychotherapeutic services of psychologists unless billed through physicians, was not merely a cost-containment device or simply "good medical practice," as claimed by Blue Shield, the court held that Blue Shield had violated the Sherman Act. Ibid.

Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1,[5] "to exclude and boycott clinical psychologists from receiving compensation under" the Blue Shield plans. App. 55. McCready further alleged that Blue Shield's failure to reimburse had been in furtherance of the alleged conspiracy, and had caused injury to her business or property for which she was entitled to treble damages and attorney's fees under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15.[6]

The District Court granted petitioners' motion to dismiss, holding that McCready had no standing under § 4 to maintain her suit.[7] In the District Court's view, McCready's standing to maintain a § 4 action turned on whether she had suffered injury "within the sector of the economy competitively endangered by the defendants' alleged violations of the antitrust laws." App. 17. Noting that the goal of the alleged boycott was to exclude clinical psychologists from a segment of the psychotherapy market, the court concluded that the "sector of the economy *competitively* endangered" by the charged violation extended "no further than that area occupied by the psychologists." *Id.*, at 18 (emphasis in original). Thus, while McCready clearly had suffered an injury by

---

[5] That section provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[6] That section provides, in pertinent part:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[7] Petitioners have argued in this Court that under § 2 of the McCarran-Ferguson Act, 15 U. S. C. § 1012, their actions were exempt from the antitrust laws as part of the "business of insurance." In ruling on petitioners' motion to dismiss, the District Court concluded that respondent had adequately pleaded a boycott beyond the protection of the McCarran-Ferguson Act, 15 U. S. C. § 1013(b). Respondent points out that on a full factual record the issue was resolved against the petitioners in *VACP*, 624 F. 2d, at 483–484. The Court of Appeals did not address this question in the present case, however, and we do not reach it here.

being denied reimbursement, this injury was "too indirect and remote to be considered 'antitrust injury.'" *Ibid.*

A divided panel of the United States Court of Appeals for the Fourth Circuit reversed, holding that McCready had alleged an injury within the meaning of § 4 of the Clayton Act and had standing to maintain the suit. 649 F. 2d 228 (1981). The court recognized that the goal of the alleged conspiracy was the exclusion of clinical psychologists from some segment of the psychotherapy market. But it held that the § 4 remedy was available to any person "whose property loss is directly or proximately caused by" a violation of the antitrust laws, and that McCready's loss was not "too remote or indirect to be covered by the Act." *Id.*, at 231.[8] The court thus

---

[8] Addressing the "target area" limitation on antitrust standing recognized in several Courts of Appeals, see n. 14, *infra*, the court concluded that the policies underlying that limitation were not implicated by McCready's claim. 649 F. 2d, at 231–232. The dissenting judge took a contrary view of the "target area" rule. He emphasized that McCready had not described her injury "as a design or goal of any antitrust violation," but "rather as a consequence thereof." *Id.*, at 232. He viewed this as the determinative factor in the proper application of the "target area" test to the facts of this case:

"In determining who has standing to sue, the courts must look at who the illegal act was aimed to injure. A bystander, who is not the intended victim of the antitrust violation but who is injured nonetheless, cannot sue under the antitrust laws. His injury is too remote." *Id.*, at 233.

In addition, the dissent argued that McCready was not within the sector of the economy "competitively endangered" by the alleged violation, agreeing with the District Court that "she operated in a market which was unrestrained so far as she was concerned." *Id.*, at 234. Finally, the dissent reasoned:

"The price of psychologists' services to her was not increased by any act of the defendants. The fact that her Blue Shield contract . . . would not reimburse her for those services had nothing to do with the price she paid for the services, which . . . were not artificially inflated by an antitrust violation. . . .

". . . There is not even a claim that her psychologists' bills are higher than they would have been had the conspiracy not existed." *Id.*, at 235–236.

remanded the case to the District Court for further proceedings. We granted certiorari. 454 U. S. 962 (1981).

## II

Section 4 of the Clayton Act, 38 Stat. 731, provides a treble-damages remedy to *"[a]ny person who shall be injured in his business or property by reason of anything* forbidden in the antitrust laws," 15 U. S. C. § 15 (emphasis added). As we noted in *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979), "[o]n its face, § 4 contains little in the way of restrictive language." And the lack of restrictive language reflects Congress' "expansive remedial purpose" in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations. *Pfizer Inc.* v. *India*, 434 U. S. 308, 313–314 (1978). See *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485–486, and n. 10, (1977); *Perma Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 139 (1968); *American Society of Mechanical Engineers* v. *Hydrolevel Corp.*, 456 U. S. 556, 572–573, and n. 10 (1982). As we have recognized, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 236 (1948).

Consistent with the congressional purpose, we have refused to engraft artificial limitations on the § 4 remedy.[9]

---

[9] In a related context we commented that "[i]n the face of [the congressional antitrust] policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress . . . ." *Radovich* v. *National Football League*, 352 U. S. 445, 454 (1957). See also *Radiant Burners, Inc.* v. *Peoples Gas Co.*, 364 U. S. 656, 659–660 (1961) *(per curiam)* (To state a claim under § 1 of the Sherman Act, "allega-

Two recent cases illustrate the point. *Pfizer Inc.* v. *India, supra,* afforded the statutory phrase "any person" its "naturally broad and inclusive meaning," *id.,* at 312, and held that it extends even to an action brought by a foreign sovereign. Similarly, *Reiter* v. *Sonotone Corp., supra,* rejected the argument that the § 4 remedy is available only to redress injury to commercial interests. In that case we afforded the statutory term "property" its "naturally broad and inclusive meaning," and held that a consumer has standing to seek a § 4 remedy reflecting the increase in the purchase price of goods that was attributable to a price-fixing conspiracy. 442 U. S., at 338. In sum, in the absence of some articulable consideration of statutory policy suggesting a contrary conclusion in a particular factual setting, we have applied § 4 in accordance with its plain language and its broad remedial and deterrent objectives. But drawing on statutory policy, our cases have acknowledged two types of limitation on the availability of the § 4 remedy to particular classes of persons and for redress of particular forms of injury. We treat these limitations in turn.[10]

## A

In *Hawaii* v. *Standard Oil Co.,* 405 U. S. 251 (1972), we held that § 4 did not authorize a State to sue in its *parens patriae* capacity for damages to its "general economy." Noting

---

tions adequate to show a violation and, in a private treble damage action, that plaintiff was damaged thereby are all the law requires").

[10] Permitting McCready to maintain this lawsuit will, of course, further certain basic objectives of the private enforcement scheme embodied in § 4. Only by requiring violators to disgorge the "fruits of their illegality" can the deterrent objectives of the antitrust laws be fully served. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S. 481, 494 (1968). See *Pfizer Inc.* v. *India,* 434 U. S. 308, 314 (1978); *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 746 (1977). But in addition to allowing Blue Shield to retain a palpable profit as a result of its unlawful plan, denying standing to McCready and the class she represents would also result in the denial of compensation for injuries resulting from unlawful conduct.

that a "large and ultimately indeterminable part of the injury to the 'general economy' . . . is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4," we concluded that "[e]ven the most lengthy and expensive trial could not . . . cope with the problems of double recovery inherent in allowing damages" for injury to the State's quasi-sovereign interests. *Id.*, at 264. See *Reiter* v. *Sonotone Corp., supra*, at 342.

In *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), similar concerns prevailed. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), had held that an antitrust defendant could not relieve itself of its obligation to pay damages resulting from overcharges to a direct-purchaser plaintiff by showing that the plaintiff had passed the amount of the overcharge on to its own customers. *Illinois Brick* was an action by an indirect purchaser claiming damages from the antitrust violator measured by the amount that had been passed on to it. Relying in part on *Hawaii* v. *Standard Oil Co., supra*, the Court found unacceptable the risk of duplicative recovery engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant. *Illinois Brick, supra*, at 730–731. The Court found that the splintered recoveries and litigative burdens that would result from a rule requiring that the impact of an overcharge be apportioned between direct and indirect purchasers could undermine the active enforcement of the antitrust laws by private actions. 431 U. S., 745–747. The Court concluded that direct purchasers rather than indirect purchasers were the injured parties who as a group were most likely to press their claims with the vigor that the § 4 treble-damages remedy was intended to promote. *Id.*, at 735.

The policies identified in *Hawaii* and *Illinois Brick* plainly offer no support for petitioners here. Both cases focused on the risk of duplicative recovery engendered by allowing

every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws. But permitting respondent to proceed in the circumstances of this case offers not the slightest possibility of a duplicative exaction from petitioners. McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her. Her psychologist can link no claim of injury to himself arising from his treatment of McCready; he has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services. And whatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits.[11]

---

[11] If there is a subordinate theme to our opinions in *Hawaii* and *Illinois Brick*, it is that the feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4. Where consistent with the broader remedial purposes of the antitrust laws, we have sought to avoid burdening § 4 actions with damages issues giving rise to the need for "massive evidence and complicated theories," where the consequence would be to discourage vigorous enforcement of the antitrust laws by private suits. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, *supra*, at 493. Thus we recognized that the task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system. See *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 264 (1972); *Illinois Brick Co.* v. *Illinois*, *supra*, at 741–742. In addition, while "[d]ifficulty of ascertainment [should not be] confused with right of recovery," *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U. S. 251, 265 (1946), § 4 plainly focuses on tangible economic injury. It may therefore be appropriate to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm. See *Hawaii* v. *Standard Oil Co.*, *supra*, at 262–263, n. 14. But like the policy against duplicative recoveries, our cautious approach to speculative, abstract, or impractical damages theories has no application to McCready's suit. The nature of her injury is easily stated: As the result of an unlawful boycott, Blue Shield failed to pay the cost she incurred for the services of a psychologist. Her damages were fixed by the plan contract and, as the

## B

Analytically distinct from the restrictions on the § 4 remedy recognized in *Hawaii* and *Illinois Brick*, there is the conceptually more difficult question "of which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4." *Illinois Brick Co.* v. *Illinois*, 431 U. S., at 728, n. 7 (emphasis added).[12] An antitrust violation may be expected to cause ripples of

Court of Appeals observed, they could be "ascertained to the penny." 649 F. 2d, at 231.

[12] We addressed two issues of "remoteness" in *Perkins* v. *Standard Oil Co.*, 395 U. S. 642 (1969). That case involved an alleged violation of § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13. Focusing on the substantive terms of § 2, we found no warrant in its "language or purpose" to engraft an "artificial" limitation on the reach of the remedy to bar what the court below had termed a "fourth level" injury. 395 U. S., at 648. We also rejected the claim that one form of damages claimed by the defendant was not the proximate result of the alleged violation. *Id.*, at 649.

The Courts of Appeals have developed a more substantial jurisprudence on the subject of "remoteness," formulating various "tests" as aids in analysis. Among the tests employed by the lower courts are those that focus on the "directness" of the injury, *e. g., Loeb* v. *Eastman Kodak Co.*, 183 F. 704, 709 (CA3 1910); *Productive Inventions, Inc.* v. *Trico Products Corp.*, 224 F. 2d 678 (CA2 1955); *Volasco Products Co.* v. *Lloyd A. Fry Roofing Co.*, 308 F. 2d 383 (CA6 1962); on its foreseeability, *e. g., In re Western Liquid Asphalt Cases*, 487 F. 2d 191, 199 (CA9 1973); *Twentieth Century Fox Film Corp.* v. *Goldwyn*, 328 F. 2d 190, 220 (CA9 1964); or on whether the injury is "arguably . . . within the zone of interests protected by the [antitrust laws]," *e. g., Malamud* v. *Sinclair Oil Corp.*, 521 F. 2d 1142, 1152 (CA6 1975). See also n. 14, *infra* ("target area" test). The Third Circuit has concluded that "§ 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems." *Bravman* v. *Basset Furniture Industries, Inc.*, 552 F. 2d 90, 99 (1977). The Third Circuit has thus rejected the definitional approach, opting instead for an analysis of the "factual matrix" presented by each case. *Ibid.* We have no occasion here to evaluate the relative utility of any of these possibly conflicting approaches toward the problem of remote antitrust injury.

harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrong-doer should not be held liable." *Id.*, at 760 (BRENNAN, J., dissenting). It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property. Of course, neither the statutory language nor the legislative history of § 4 offers any focused guidance on the question of which injuries are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under § 4; indeed, the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective. But the potency of the remedy implies the need for some care in its application. In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of "proximate cause."[13] See *Perkins* v. *Standard Oil Co.*, 395 U. S. 642, 649 (1969); *Karseal Corp.* v. *Richfield Oil Corp.*, 221

---

[13] The traditional principle of proximate cause suggests the use of words such as "remote," "tenuous," "fortuitous," "incidental," or "consequential" to describe those injuries that will find no remedy at law. See, *e. g.*, *South Carolina Council of Milk Producers, Inc.* v. *Newton*, 360 F. 2d 414, 419 (CA4 1966). And the use of such terms only emphasizes that the principle of proximate cause is hardly a rigorous analytic tool. See, *e. g.*, *Palsgraf* v. *Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99 (1928); *id.*, at 351–352, 162 N. E., at 103 (Andrews, J., dissenting) ("What is a cause in a legal sense, still more what is a proximate cause, depend in each case upon many considerations. . . . What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point"). It bears affirming that in identifying the limits of an explicit statutory remedy, legislative intent is the controlling consideration. Cf. *Mer-*

F. 2d 358, 363 (CA9 1955). In applying that elusive concept to this statutory action, we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

### (1)

It is petitioners' position that McCready's injury is too "fortuitous" and too "incidental" to and "remote" from the alleged violation to provide the basis for a § 4 action.[14] At the outset, petitioners argue that because the alleged conspiracy was directed by its protagonists at psychologists, and not at subscribers to group health plans, only psychologists might maintain suit. This argument may be quickly disposed of.

We do not think that because the goal of the conspirators was to halt encroachment by psychologists into a market that

---

*rill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 377–378 (1982); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1, 13 (1981); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16 (1979).

[14] In so arguing, petitioners advert to the "target area" test of antitrust standing that prevails in the Courts of Appeals for the First, Second, and Fifth Circuits. See, *e. g., Pan-Islamic Trade Corp.* v. *Exxon Corp.,* 632 F. 2d 539, 546 (CA5 1980); *Engine Specialties, Inc.* v. *Bombardier Ltd.,* 605 F. 2d 1, 18–19 (CA1 1979); *Calderone Enterprises Corp.* v. *United Artists Theatre Circuit, Inc.,* 454 F. 2d 1292 (CA2 1971). Petitioners place special reliance on the following frequently cited formulation of the "target area" principle:

"[I]n order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with participants in an alleged antitrust conspiracy, rather than being 'targets' themselves." *Id.,* at 1295.

physicians and psychiatrists sought to preserve for themselves, McCready's injury is rendered "remote." The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators. Here the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market.[15] McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely "'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S., at 489, quoting *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 125 (1969).

Petitioners next argue that even if the § 4 remedy might be available to persons other than the competitors of the conspirators, it is not available to McCready because she was not an economic actor in the market that had been restrained. In petitioners' view, the proximate range of the violation is limited to the sector of the economy in which a violation of the type alleged would have its most direct anticompetitive effects. Here, petitioners contend that that market, for purposes of the alleged conspiracy, is the market in group health care plans. Thus, in petitioners' view, standing to redress

---

[15] Nor does the "target area" test applied by the Courts of Appeals "'imply that it must have been a purpose of the conspirators to injure the particular individual claiming damages.'" See *Schwimmer* v. *Sony Corp. of America*, 637 F. 2d 41, 47–48 (CA2 1980), quoting *Twentieth Century Fox Film Corp.* v. *Goldwyn*, 328 F. 2d, at 220.

the violation alleged in this case is limited to participants in that market—that is, to entities, such as McCready's employer, who were purchasers of group health plans, but not to McCready as a beneficiary of the Blue Shield plan.[16]

Petitioners misconstrue McCready's complaint. McCready does not allege a restraint in the market for group health plans. Her claim of injury is premised on a concerted refusal to reimburse under a plan that was, in fact, purchased and retained by her employer for her benefit, and that as a matter of contract construction and state law permitted reimbursement for the services of psychologists without any significant variation in the structure of the contractual relationship between her employer and Blue Shield.[17] See n. 2, *supra*. As a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was "within that area of the economy . . . endangered by [that] breakdown of competitive conditions"

[16] Petitioners borrow selectively from *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977), in arguing that McCready's § 4 claim is "unrelated to any reduction in competition caused by the alleged boycott," because the injury she alleges "is the result of the terms of her insurance contract, and not the result of a reduction in competition." Brief for Petitioners 16. Extracting additional language from *Brunswick*, they argue that "McCready would have suffered the identical 'loss'—but no compensable 'injury' as long as her employer, which acted independently in an unrestrained market, continued to purchase a group insurance contract that did not cover the services of clinical psychologists." Brief for Petitioners 16–17 (footnote omitted).

[17] Nor do we think that her employer's decision to retain Blue Shield coverage despite its continued failure to reimburse for the services of a psychologist—or indeed, her employer's unexercised option to terminate that relationship—is an intervening cause of McCready's injury. Although her employer's decision to purchase the Blue Shield plan for her benefit was in some sense a factor that contributed independently to McCready's injury, her coverage under the Blue Shield plan may, at this stage of the litigation, properly be accepted as a given, and the proper focus in evaluating her entitlement to raise a § 4 damages claim is on Blue Shield's change in the terms of the plan to link reimbursement to a subscriber's choice of one group of psychotherapists over another.

resulting from Blue Shield's selective refusal to reimburse. *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F. 2d 122, 129 (CA9 1973).

(2)

We turn finally to the manner in which the injury alleged reflects Congress' core concerns in prohibiting the antitrust defendants' course of conduct. Petitioners phrase their argument on this point in a manner that concedes McCready's participation in the market for psychotherapy services and rests instead on the notion that McCready's injury does not reflect the "anticompetitive" effect of the alleged boycott. They stress that McCready did not visit a psychiatrist whose fees were artificially inflated as a result of the competitive advantage he gained by Blue Shield's refusal to reimburse for the services of psychologists; she did not pay additional sums for the services of a physician to supervise and bill for the psychotherapy provided by her psychologist; and that there is no "claim that her psychologists' bills are higher than they would have been had the conspiracy not existed."[18] In promoting this argument, petitioners rely heavily on language in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., supra.*

In *Brunswick*, respondents were three bowling centers who complained that petitioner's acquisition of several financially troubled bowling centers violated § 7 of the Clayton Act by lessening competition or tending to create a monopoly. In seeking damages, "respondents attempted to show that had petitioner allowed the [acquired] centers to close, respondents' profits would have increased." *Id.*, at 481. The Court of Appeals endorsed the legal theory upon which respondents' claim was based, *id.*, at 483, holding that "any loss 'causally linked' to 'the mere presence of the violator in the market'" was compensable under § 4, *id.*, at 487. We reversed, holding that the injury alleged by respondents was not of "'the type that the statute was intended to forestall.'"

---

[18] 649 F. 2d, at 236 (Widener, J., dissenting).

*Id.*, at 487–488, quoting *Wyandotte Transportation Co. v. United States,* 389 U. S. 191, 202 (1967). Indeed, the Court noted that respondents sought in damages "the profits they would have realized had competition been *reduced.*" 429 U. S., at 488 (emphasis added).

We can agree with petitioners' view of *Brunswick* as embracing the general principle that treble-damages recoveries should be linked to the procompetition policy of the antitrust laws. But petitioners seek to take *Brunswick* one significant step farther. In a passage upon which petitioners place much reliance, we stated:

> "[F]or plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' *Zenith Radio Corp.* v. *Hazeltine Research,* 395 U. S., at 125." *Id.*, at 489 (emphasis in original; footnote omitted).

Relying on this language, petitioners reason that McCready can maintain no action under § 4 because her injury "did not reflect the anticompetitive effect" of the alleged violation.

*Brunswick* is not so limiting. Indeed, as we made clear in a footnote to the relied-upon passage, a § 4 plaintiff need not "prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Id.*, at 489, n. 14. Thus while an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 po-

tentially offers redress, see *Reiter* v. *Sonotone Corp.*, 442 U. S. 330 (1979), that is not the only form of injury remediable under § 4. We think it plain that McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.

McCready charges Blue Shield with a purposefully *anticompetitive scheme.* She seeks to recover as damages the sums lost to her as the consequence of Blue Shield's attempt to pursue that scheme.[19] She alleges that Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required,[20] and that the heart of its scheme was the offer of a Hobson's choice to its subscribers. Those subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice. In the latter case, the antitrust injury would have been borne in the first instance by the competitors of the conspirators, and inevitably—though indirectly—by the customers of the competitors in the form of suppressed competition in the psychotherapy market; in the former case, as it happened, the injury was borne directly by the customers of the competitors. McCready did not yield to Blue Shield's coercive pressure, and bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services. Although

---

[19] *Brunswick* held that a claim of injury arising from the preservation or enhancement of competition is a claim "inimical to the purposes of [the antitrust] laws," 429 U. S., at 488. Most obviously, McCready's claim is quite unlike the claim asserted by the plaintiff in *Brunswick* for she does not seek to label increased competition as a harm to her. Nevertheless, we agree with petitioners that the relationship between the claimed injury and that which is unlawful in the defendant's conduct, as analyzed in *Brunswick*, is one factor to be considered in determining the redressability of a particular form of injury under § 4.

[20] Or at the least, Blue Shield sought to compel McCready to employ the services of a physician in addition to those of a psychologist.

McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market. In light of the conspiracy here alleged we think that McCready's injury "flows from that which makes defendants' acts unlawful" within the meaning of *Brunswick*, and falls squarely within the area of congressional concern.[21]

### III

Section 4 of the Clayton Act provides a remedy to "[a]ny person" injured "by reason of" anything prohibited in the

---

[21] JUSTICE REHNQUIST, dissenting, is of course correct in asserting that the "injury suffered by the plaintiff must be of the type the antitrust laws were intended to forestall," *post*, at 486. But JUSTICE REHNQUIST's dissent takes an unrealistically narrow view of those injuries with which the antitrust laws might be concerned, and offers not the slightest hint— beyond sheer *ipse dixit*—to help in determining what kinds of injury are not amenable to § 4 redress. For example, the dissent acknowledges that "a distributor who refused to go along with the retailers' conspiracy [to injure a disfavored retailer] and thereby lost the conspiring retailers' business would . . . have an action against those retailers," *post*, at 490. The dissent characterizes this circumstance as a "concerted refusal to deal," and is thus willing to acknowledge the existence of compensable injury. But the dissent's is not the only pattern of concerted refusals to deal. If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions. And plainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.

McCready and the banker and the distributor are in many respects similarly situated. McCready alleges that she has been the victim of a concerted refusal by psychiatrists to reimburse through the Blue Shield plan. Because McCready is a consumer, rather than some other type of market participant, the dissent finds itself unwilling to acknowledge that she might have suffered a form of injury of significance under the antitrust laws. But under the circumstances of this case, McCready's participation in the market for psychotherapeutic services provides precisely that significance.

antitrust laws. We are asked in this case to infer a limitation on the rule of recovery suggested by the plain language of §4. But having reviewed our precedents and, more importantly, the policies of the antitrust laws, we are unable to identify any persuasive rationale upon which McCready might be denied redress under §4 for the injury she claims. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

Respondent's alleged "antitrust injury" in this case arises from a health insurance coverage dispute with her insurer, petitioner Blue Shield of Virginia. Respondent's complaint is that Blue Shield reimburses its subscribers for treatment by psychiatrists, but not by psychologists unless their services are supervised and billed by treating physicians. Respondent was treated by a clinical psychologist, but when she submitted claims to Blue Shield, she was denied reimbursement.

Respondent alleged in her complaint that Blue Shield's refusal to reimburse her for the costs she incurred in obtaining the services of a psychologist furthered a conspiracy by petitioners "to exclude and boycott clinical psychologists from receiving compensation under" Blue Shield's plan. App. 55. Blue Shield's refusal-to-reimburse policy is alleged to constitute a form of economic pressure on McCready and other Blue Shield subscribers to obtain the services of psychiatrists rather than psychologists. By employing this economic pressure on Blue Shield subscribers, petitioners are alleged to have placed clinical psychologists at a competitive disadvantage with regard to psychiatrists in the market for insurance-reimbursed psychological services.

The Court concludes that McCready's inability to obtain reimbursement for the psychological services she actually obtained permits her to maintain an action to enforce the anti-

trust laws pursuant to §4 of the Clayton Act. According to the Court, one who suffers economic loss as a necessary step in effecting the end of a conspiracy has "standing" to sue pursuant to §4. *Ante,* at 479, 483–484. I disagree.

Section 4 of the Clayton Act authorizes suits for treble damages by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U. S. C. §15. It is not enough, however, for a plaintiff merely to allege that the defendant violated the antitrust laws and that he was injured. *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 486–489 (1977). See *Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 263, n. 14 (1972). The injury suffered by the plaintiff must be of the type the antitrust laws were intended to forestall. *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., supra,* at 487–488.

> "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" 429 U. S., at 489 (citation omitted).

Although McCready alleges that she would have been reimbursed had it not been for the conspiracy, I do not think that she has made a sufficient allegation of "antitrust injury" within the meaning of *Brunswick.*

Standing alone, a refusal by an insurer to reimburse its insured does not constitute a violation of the Sherman Act. At most, such an action on the part of an insurer may amount to a breach of a contract or a violation of relevant state law regulating the insurance industry.[1] According to the Court,

---

[1] In addition to the antitrust claim, McCready's complaint asserts a claim for breach of contract under the principles of pendent jurisdiction.

however, what distinguishes this case from the typical insurance coverage dispute is either the *purpose* behind or the *effect* of Blue Shield's refusal to reimburse.  If Blue Shield violated the antitrust laws by its nonreimbursement policy, it was only because that policy was used as a *means* of putting psychologists at a competitive disadvantage in relation to psychiatrists.

Two conceivable grounds therefore may be divined from the Court's opinion to support its conclusion that McCready has suffered "antitrust injury" when Blue Shield refused to reimburse her costs in obtaining the services of a psychologist.  The first theory is that McCready may recover simply because petitioners' nonreimbursement policy was *intended* to put clinical psychologists at a competitive disadvantage. According to the Court, this must be so even if Blue Shield's refusal to reimburse her would be entirely legal under the antitrust laws in the absence of such a purpose to competitively injure third parties.  Blue Shield's intent or purpose renders the discriminatory reimbursement policy illegal. Under this theory, it would seem to be irrelevant for the Court's purposes whether McCready obtained the services of a psychologist or a psychiatrist so long as the illegal intent is present and she suffered economic loss as a result.[2]

The second conceivable rationale is a flat rule that recovery is permitted by those persons who suffer economic loss as a necessary step in effecting a conspiracy to place third par-

---

App. 57–58.  She also alleges that Blue Shield's policy contravened state law.  *Id.*, at 55–56.

[2] The Court explains that those subscribers, such as McCready, who did not yield to Blue Shield's coercive pressures suffer from Blue Shield's sanctions by way of increased costs in obtaining the services of a psychologist. Those subscribers who did yield to Blue Shield's pressure suffer antitrust injury indirectly because of suppressed competition in the psychotherapy market.  *Ante*, at 483–484.  I do not understand the Court to conclude that *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), would not bar recovery by a subscriber, as opposed to a psychologist, in the latter situation.

ties at a competitive disadvantage.[3]   Under this theory, McCready may recover merely by demonstrating that she was a "tool" of petitioners' effort to disable psychologists from competing with psychiatrists in the market for insurance-reimbursed psychological services.   She may recover because she did not yield to the economic pressure imposed on her.[4]   The theory is that McCready may recover because her loss is linked to petitioners' efforts to enforce a "boycott" of third parties.

I believe that such reasoning is foreclosed by the Court's decision in *Brunswick*.   In order to recover, a plaintiff must demonstrate that the nature of the injury *he suffered* is of the type that makes the challenged practice illegal.   In *Brunswick*, the merger may well have violated § 7 of the Clayton Act in the abstract or even as to competitors not before the Court.   Yet, we held that the plaintiffs in *Brunswick* could not recover because they did not suffer from the *anticompetitive* effects of the merger.   We rejected the contention that it was sufficient to show merely that the defendant's merger violated § 7 and that there existed a causal link between that merger and an economic loss.   429 U. S., at 486–489.   In-

---

[3] The Court suggests a third theory—that McCready has standing herself as a target of a concerted refusal to deal.   See *ante*, at 484, n. 21; *infra*, at 490–491.

[4] In order to recover under this theory, it would seem that respondent must prove at trial that she actually refused to yield to the economic pressure created by Blue Shield's reimbursement policy.   If she decided to obtain the services of a psychologist rather than a psychiatrist without knowing of Blue Shield's policy, it cannot be said that her "injury" was proximately related to petitioners' alleged anticompetitive conduct.   If she discovered the policy only after she sought reimbursement, then it cannot be said that Blue Shield's policy had any effect on McCready's conduct as a consumer in the market for psychotherapeutic services.   This, of course, is not to say that a person in all circumstances must have knowledge of a defendant's anticompetitive activities before one may challenge that activity.   One may not be a victim of economic pressure, however, if one acted obliviously to that pressure.

stead, the required showing is that the type of harm suffered by the plaintiff is that which makes the challenged practice illegal. *Id.*, at 489.

Therefore, McCready may not recover merely by showing that she has suffered an economic loss resulting from a practice the legality of which depends upon its effect on a third party. McCready must show that the challenged practice is illegal with regard to its effect upon her. But petitioners' policy is alleged to be illegal not by virtue of its effect upon Blue Shield's subscribers but because of its effect upon psychologists. McCready alleges no anticompetitive effect upon herself. She does not allege that the conspiracy has affected the *availability* of the psychological services she sought and actually obtained. Nor does she allege that the conspiracy affected the *price* of the treatment she received.[5] She does not allege that her injury was caused by any reduction in competition between psychologists and psychiatrists, nor that it was the result of any *success*[6] Blue Shield achieved in its "boycott" of psychologists. She seeks recovery solely on the basis that Blue Shield's reimbursement policy *failed* to alter her conduct in a fashion necessary to foreclose psychologists from obtaining the patronage of Blue Shield's subscribers.

If the important consideration is whether the challenged practice is illegal with regard to its effect on the plaintiff, then it would be irrelevant for the plaintiff's purposes that the conspiracy might also adversely affect competition on another level of the market. For example, a group of retailers

---

[5] By excluding psychologists from the market, psychiatrists may well be able to increase their charges for psychotherapeutic services, which in turn, may raise the insurance rates charged by Blue Shield. McCready, however, alleges no such injury to herself on this theory.

[6] Because McCready obtained the services of a psychologist, it cannot be said that the psychologists were injured by the economic pressure Blue Shield placed on McCready and the class of subscribers she represents. See *ante*, at 475.

may threaten to refuse to do business with those distributors that continue to do business with a disfavored retailer. If the distributors agreed to cooperate with the conspiring retailers, then the disfavored retailer would have an action against the agreeing distributors and the conspiring retailers. See, *e. g.*, *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959). I would think that a distributor who refused to go along with the retailers' conspiracy and thereby lost the conspiring retailers' business would also have an action against those retailers. Such an action would be based upon the conspirators' concerted refusal to deal with the distributor which *itself* would be unlawful under the antitrust laws. Such an action, unlike the instant case, would not depend upon the anticompetitive effect of the challenged practice upon a third party. The distributor would have an action not on the ground that he was caught in the middle of an attempted boycott of participants on another level of the market, but because *he* was boycotted. The boycott of the distributor puts him at a competitive disadvantage to those distributors who are unaffected by the retailers' conspiracy and to those distributors who agree to participate.[7]

McCready, however, does not allege that petitioners engaged in a concerted refusal to deal with *her*. As the Court is aware, *ante*, at 468–470, McCready has alleged that petitioners

---

[7] As pointed out by the Court, a concerted refusal to deal may take many forms. *Ante*, at 484, n. 21. I would agree that the bank could sue in the Court's hypothetical because, as conceded by the Court, the bank's ability to compete with other banks would be adversely affected. By contrast, my disagreement with the Court is that it permits McCready to sue solely because of an injury to a level of the market in which she does not participate. Moreover, McCready does not allege that petitioners' conspiracy adversely affected competition between psychologists and psychiatrists in such a manner as to adversely affect the price or supply of psychotherapeutic services available to her as a consumer. Thus, McCready's case is clearly distinguishable from that of the bank's in the Court's hypothetical.

violated the antitrust laws by conspiring to exclude clinical psychologists from the coverage of Blue Shield plans, and that this conspiracy foreseeably injured her. The Court apparently concludes, however, that McCready has also sufficiently alleged that petitioners have engaged in a concerted refusal to deal with *her*, and that this is the gravamen of her antitrust complaint: "McCready alleges that she has been the victim of a concerted refusal by psychiatrists to reimburse through the Blue Shield plan." *Ante*, at 484, n. 21. It may be that the Court today is merely holding that a boycottee has "standing" to sue under §4. Were this the issue presented by this case, I have little doubt that the Court merely would have denied certiorari.

But McCready simply does not, and could not, claim standing as the target of a concerted refusal to deal. Neither Blue Shield nor the psychiatrists threatened to cease doing business with McCready if she obtained the services of a psychologist rather than a psychiatrist. McCready alleges only that under the Blue Shield policy she could not obtain reimbursement for services rendered by psychologists. If such a claim is sufficient to make out a concerted refusal to deal, then any consumer who could not obtain a product or service on the precise terms he desires could claim to be the victim of a "boycott." Most importantly, McCready alleges that Blue Shield's policy violates the antitrust laws only by virtue of its anticompetitive effect on *psychologists*. She does not allege that Blue Shield's policy is illegal in any way because of its effect on *subscribers*.

The Court, however, dismisses such concerns by stating in conclusory terms that "the injury [McCready] suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Ante*, at 484. I trust that the Court is not holding that a plaintiff may escape dismissal of the complaint merely by alleging that he suffered an economic loss "inextricably

intertwined" with an injury the defendants intended, but failed, to inflict upon a third party.[8]   Although the Court may view itself as successfully deciding this case on its peculiar facts, it has wholly failed to provide any sort of reasoned basis for its decision.   Especially in the area of antitrust law, labels do not suffice when analysis is necessary.

I would reverse the judgment of the Court of Appeals because McCready has not alleged that she has suffered antitrust injury, but at best injury attributable to a breach of contract on the part of Blue Shield.

JUSTICE STEVENS, dissenting.

Respondent is a consumer of psychotherapeutic services. The question is whether she has been injured in her "business or property by reason of anything forbidden in the antitrust laws."[1]   The alleged antitrust violation is an agreement between petitioners Neuropsychiatric Society of Virginia and Blue Shield that Blue Shield would refuse to reimburse subscribers for payments made to clinical psychologists for charges that were not billed through a physician.   The objective of the alleged conspiracy was to induce subscribers to patronize psychiatrists instead of psychologists.

For purposes of decision, I assume that the alleged agreement is unlawful.   In analyzing the sufficiency of respondent's damage claim, it is helpful first to consider the situation

---

[8] If McCready's injury were truly "inextricably intertwined" with any injury actually suffered by the psychologists, the risk of duplicative recovery and the practical problems inherent in distinguishing the loss suffered by her from the loss suffered by the psychologists may mean that either subscribers or psychologists, but not both, may recover.   See *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720 (1977).

[1] "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."   15 U. S. C. § 15.

in which the conspiracy would have its maximum impact on the relevant market. Given their objective, petitioners' conspiracy would be most effective if they made it perfectly clear to subscribers that they would not be reimbursed if they consulted psychologists instead of psychiatrists. For without this information, a subscriber's choice between a psychologist and a psychiatrist would not be affected by the conspiracy. Thus, I first assume that the Blue Shield insurance policy did not cover services performed by psychologists and that subscribers as a class were fully aware of this exclusion.

On this assumption, a Blue Shield subscriber who is a potential consumer in the relevant market has at least three options. He may: (1) forgo treatment entirely; (2) go to a psychiatrist; or (3) go to a psychologist.[2] If he exercises his first option, his illness may worsen but he will not have suffered any economic injury cognizable under the antitrust laws.[3] If he exercises his second option, his property will not be diminished because Blue Shield will reimburse him for his payment to the psychiatrist. If he exercises his third option, his property will be diminished to the extent of his unreimbursed payment to the psychologist, but he will have received in exchange psychotherapeutic services that pre-

---

[2] In *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, we held that antitrust injury was limited to " 'the type of loss that the claimed violations . . . would be likely to cause.' " *Id.*, at 489 (quoting *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 125). I would expect that the alleged violation in this case would be most likely to cause knowledgeable members of the class of potential consumers of psychotherapeutic services to exercise either the first or the second option. It is fair to assume that the third situation—the one in which respondent finds herself—would be "unlikely" to result.

[3] The subscriber may have to undergo more extensive treatment later if he forgoes treatment now and his illness worsens. Any consequential economic injury, however, would no more constitute antitrust injury than the economic injury suffered by a consumer who decides to forgo a purchase on the ground that the price of the goods or services was fixed at an artificially high level.

sumably were worth the payment.[4]   The fact that he voluntarily elected to spend money for services not covered by his insurance policy would have no greater legal significance than a similar voluntary decision by a person who was not a Blue Shield subscriber.[5]   It thus seems clear to me that whatever option the fully informed subscriber exercises, he would suffer no injury to his property by reason of the restriction of insurance coverage to psychotherapeutic services performed by psychiatrists.

This conclusion is reinforced by the fact that Blue Shield subscribers have the additional option of going to a psychologist while retaining their rights to reimbursement under the policy.   According to respondent's complaint, Blue Shield did not refuse to reimburse all payments made by subscribers to psychologists, but only those payments not billed through a physician.   Even if a fully informed subscriber's preference for psychologists over psychiatrists were protected by the antitrust laws, that preference was not denied by the antitrust violation alleged in this case.[6]   The Hobson's choice de-

---

[4] If treatment by a psychiatrist and treatment by a psychologist were fungible, then a subscriber who exercised this third option effectively would be paying twice for the psychotherapeutic service, once to the insurer in premiums and once to the psychologist in an unreimbursable payment.   But the subscriber's exercise of this option presumably indicates that treatment by a psychologist is more valuable to him than treatment by a psychiatrist.   If that be true, the subscriber is in the same situation as any policyholder who desires a service for which he has not purchased insurance.

[5] If the subscriber would purchase a service that was covered by the Blue Shield policy, such as a surgical operation, then he would be reimbursed by Blue Shield for that payment.   If respondent's antitrust claim is that petitioners have engaged in an unlawful boycott, it therefore is manifest that respondent is not the boycottee.   For petitioners have not refused to deal with respondent—they offer her the same coverage as any other subscriber or potential subscriber.

[6] Presumably, the charge (if any) of the referring physician would be reimbursable under the policy.   In any event, the complaint does not claim damages based on any such unreimbursed charge.

scribed by the Court, *ante*, at 483, simply does not fit this case.

The availability of this fourth option would seem to indicate that respondent, in fact, was not fully aware of the scope of her policy's coverage. If her lack of understanding was caused by fraud or deception, she should be able to recover in a common-law action. If the misunderstanding was her own fault, that circumstance should not provide a basis for an antitrust recovery that would not be available if she had been fully informed.

Nor is the deficiency in respondent's complaint cured if the assumption about the insurance coverage is reversed. Although her antitrust claim would be more credible if Blue Shield excluded coverage of services performed by psychologists, respondent alleged in the second count of her complaint that the insurance policy, properly construed under applicable principles of Virginia law, provided coverage for services performed by psychologists, but that Blue Shield nevertheless refused to reimburse her for the payments she made to her psychologist. If a subscriber does not suffer antitrust injury when the insurance policy excludes coverage of services performed by psychologists, it would be anomalous to conclude that the availability of a breach-of-contract claim would in any way enhance his standing. The right to recover under the federal antitrust laws cannot be derived from a right to recover under state law.

Because respondent's complaint discloses no basis for concluding that she has suffered an injury to her property by reason of the alleged antitrust violation, I respectfully dissent.