Richmond

# BLUE CROSS OF VIRGINIA, ET AL.

## v.

# COMMONWEALTH OF VIRGINIA, EX REL., ETC.

August 28, 1980.

Record No. 800056.

Present: All the Justices.

R. Gordon Smith (Richard L. Williams; Gilbert E. Schill, Jr.; James H. Walsh; J. Christopher Wiltshire; McGuire, Woods & Battle, on briefs), for appellants.

Anthony Gambardella, Assistant Attorney General (Marshall Coleman, Attorney General; John F. Kay, Jr.; M. Scott Hart; T. J. Markow; Mays, Valentine, Davenport & Moore; Shaia, Stout & Markow, P.C., on briefs), for appellees.

No brief or argument for State Corporation Commission, appellee.

COMPTON, J., delivered the opinion of the Court.

In *Blue Cross/Blue Shield* v. *Commonwealth*, 218 Va. 589, 239 S.E.2d 94 (1977), we decided the State Corporation Commission had jurisdiction to determine the constitutionality of a statute, amended in 1973, requiring that prepaid medical and surgical plans allow or pay for certain services rendered by optometrists, opticians and psychologists. Subsequently, the Commission declared the statute constitutional. We now review that determination.

As authorized by applicable enabling statutes, a group of physicians as well as a hospital or group of hospitals may conduct within a fixed geographical area, through a nonstock corporation as agent for them, a plan or plans for furnishing prepaid medical, surgical, hospital and related services. Code §§ 38.1-810, -811 and -822.1 (1980 Cum. Supp.).[1] Under the statutory framework, all hospitals, nonstock corporations and physicians participating in such a plan shall be jointly and severally liable on all contracts made for the purposes of the plan by the nonstock corporate agent. Code § 38.1-814. Any plan providing medical and surgical or related services of a panel of medical practitioners must be so organized to assure that any person covered under the plan shall have free choice of the medical practitioners available and participating in the plan. Code § 38.1-820.

Appellants Blue Cross of Virginia and Blue Shield of Virginia, defendants below, are nonstock, nonprofit Virginia corporations which have been established by certain Virginia hospitals, "participating hospitals," and certain Virginia physicians, "participating physicians," to act as their agents in conducting plans for furnishing prepaid hospital and prepaid medical or surgical and similar or related services to persons subscribing, "subscribers," to the Plans. These hospitals and physicians have entered into individual agreements with Blue Cross, "participating hospital agreements," and Blue Shield, "participating physician agreements," respectively. Only those practicing physicians within Blue Cross/Blue Shield's geographical area who voluntarily execute participating physician agreements, not all physicians, are "participating physicians."

Blue Cross/Blue Shield sell prepaid medical care policies, "subscription contracts," which insure only specified medically necessary

---

[1] When this proceeding began in 1977, the relevant enactments were codified in Chapter 11, Title 32 of the Code, dealing with "Health." See §§ 32-195.1 through -195.20:1 (1973 Repl. Vol.). In 1979, as the result of legislative amendment, addition and repeal, the statutes were renumbered and placed in Chapter 23, Title 38.1 of the Code, entitled "Insurance." Acts 1979, ch. 721. For clarity and ease of reference we will cite to the statutes by their present numbers.

services of physicians. Many of the subscription contracts define "physician" as "a duly licensed physician legally entitled to practice medicine and surgery." To be "medically necessary," according to the Blue Cross/Blue Shield Group Major Medical Certificate, the services must be consistent with the diagnosis and treatment of the patient's condition, be in accord with standards of good medical practice, not be for the convenience of the patient or the physician, and be performed in the least costly setting required by the patient's medical condition.

Blue Shield's basic contract does not cover services for outpatient treatment of nervous and mental illness. Upon payment of an increased premium, however, Blue Cross/Blue Shield offer coverage under a Major Medical contract for medically necessary services for the outpatient treatment of nervous and mental disorders. Under these contracts, the companies pay for medically necessary psychotherapy and other services rendered by psychologists as well as psychiatrists. In order to assure that the treatment is medically necessary and to control costs, Blue Cross/Blue Shield require that a physician supervise and bill the psychologist's services.

Similarly, with respect to their subscription contracts covering treatment for eye care problems, the companies will reimburse for medically necessary services rendered by optometrists and opticians only when such services are performed under the supervision of and billed through a physician.

In 1973, the General Assembly amended then Code § 32-195.10:1, now § 38.1-824, by adding language which generated this controversy. *See* Acts 1973, ch. 428. Insofar as pertinent to this appeal the statute provides as follows, with the portion added in 1973 italicized by us:

**§ 38.1-824. Services of certain practitioners other than physicians to be covered.**—No plan for furnishing prepaid medical and surgical, and similar or related services, or any of such services, shall fail or refuse, either directly or indirectly, to allow or to pay for such services, or any part thereof, rendered by any doctor of podiatry, doctor of chiropody, [*or*] *optometrist, optician,* [*and*] *psychologist,* . . . duly licensed to practice in Virginia, to the holder of any contract or subscription contract issued under or pursuant to such plan if the services rendered (i) are services provided for by such contract or subscription contract, . . . and (ii) are services which the doctor of podiatry,

doctor of chiropody, [*or*] *optometrist, optician,* [*and*] *psychologist* . . . is licensed to render in Virginia.

This proceeding commenced in April of 1977 when appellee State Corporation Commission, plaintiff below, entered an order reciting that the requirements of the statute in issue here were, by operation of law, a part of all subscription contracts issued by Blue Cross/Blue Shield. The order stated that the Commission's Bureau of Insurance had approved for issuance by the companies certain subscription contracts which provided for payment of psychological services, only if such services were rendered at the direction and under the supervision of a physician. The Commission's order stated that such provisions seemed to be contrary to the statute in question and ordered the companies to appear before the Commission and show cause why the Commission should not declare void all provisions of the companies' subscription contracts which were contrary to the statute.

Responding to the show cause order, defendants Blue Cross/Blue Shield admitted they had failed to comply with the statute as it related to the services of psychologists, optometrists and opticians, but attacked the validity of the statute on state and federal constitutional grounds. Thereafter, the Commission refused to adjudicate the constitutional question, being of opinion it had no jurisdiction to do so, and declared void all subscription contracts which were contrary to the statute. The companies appealed and, in November of 1977, we reversed the action of the Commission, holding the Commission had authority to, and should, pass upon the constitutionality of the statute. *Blue Cross/Blue Shield* v. *Commonwealth,* 218 Va. at 598, 239 S.E.2d at 98.

Upon remand of the proceeding to the Commission, appellee the Attorney General of Virginia, having intervened as a plaintiff on behalf of the Commonwealth, moved in December of 1977 for summary judgment, taking the position that enactment of the statute in question was a valid and proper exercise of the Commonwealth's police power. Pursuant to an order of the Commission, the defendant companies filed in January of 1979 prepared testimony and exhibits, so-called "pre-filed testimony," of 15 witnesses they anticipated presenting before the Commission on the day of the hearing. Subsequently, appellees Virginia Academy of Clinical Psychologists and Virginia Optometric Association, having also intervened as plaintiffs, filed separate motions for summary judgment likewise asserting the constitutional validity of the statute in controversy.

On February 14, 1979, preliminary to the evidentiary hearing scheduled for that day, the Commission entertained oral argument on the several motions for summary judgment based only on the companies' pre-filed testimony, the intervenors' prepared testimony having been scheduled to be filed after February 14 and before a second hearing date set for April 23, 1979. Upon conclusion of the argument, the Commission, one member dissenting, ruled from the bench that the several motions would be granted. Following the February 1979 oral pronouncement, Blue Cross/Blue Shield moved that the bench decision be reconsidered and that partial summary judgment be granted in their favor.

Subsequently, by order and written opinion dated September 10, 1979, the Commission majority, *inter alia,* declared the statute to be constitutional with respect to opticians, optometrists and psychologists, declared void the provisions of all subscription contracts which were contrary to Code § 38.1-824, and withdrew the approval by the Bureau of Insurance of such provisions. The dissenting commissioner, in a separate opinion, took the position that the constitutional issue was prematurely decided on motions for summary judgment. In a second order entered on September 10, 1979, the Commission, with the same member dissenting, denied the companies' post-hearing motions. In this appeal of right, Code § 38.1-832, defendants Blue Cross/Blue Shield assign error to both September 1979 orders.

The principal issue raised by the assignments of error is whether the Commission correctly decided that Code § 38.1-824 is constitutionally valid. Linked with that question are several procedural questions. We will digress from the central issue to decide the procedural matters first.

▮ Relying on settled principles applicable to motions for summary judgment in civil actions at law in courts of record, defendants Blue Cross/Blue Shield point out that "[s]ummary judgment shall not be entered if any material fact is genuinely in dispute." Rule 3:18. Acknowledging they had the affirmative on the constitutional issue, defendants argue the intervenors "obviously dispute some of the facts set forth in [the] . . . pre-filed evidence." Thus, they say, in order for the Commission to dispose of the case at the summary judgment stage, it "must have determined either that none of the disputed facts were material to the constitutional issues raised, or that even resolving all disputed facts in favor of Blue Cross/Blue Shield, the evidence— disputed and undisputed—was not sufficient to overcome the presumption that § 38.1-824 is constitutional." Defendants argue that

the Commission erred in reaching either conclusion under the evidence.

One facet of defendants' procedural argument is that they were deprived of the opportunity to present their entire case. They argue, first, that certain "public witnesses" had not been called to the stand on the date of the hearing and, second, that defendants were not afforded the opportunity to cross-examine their opponents' witnesses. An examination of the record reveals no abuse of the Commission's discretion.

In May of 1978, following remand of the first phase of this dispute, the Commission ordered that "[a]ll testimony to be submitted by the parties shall be pre-filed." (Emphasis added). The first order entered on September 10, 1979 recited that pursuant to an earlier order

consented to by *all* parties, defendants on January 26, 1979 pre-filed testimony and exhibits of each witness expected to testify on their behalf in this matter, which pre-filed testimony and exhibits, as amended and supplemented, were *stipulated* by *all* parties to be *the* testimony and exhibits of defendants' witnesses and have been made part of the record in this case; (emphasis ours).

From the foregoing recitals, amply supported by the record, it is manifest the defendants were directed to, and did, pre-file their full and complete testimony. For example, at one point during the February 1979 oral argument counsel for the defendants said "our evidence is in." That was an accurate evaluation of the state of the record. There were 284 pages of prepared direct testimony from defendants' 15 witnesses accompanied by an exhibit containing 241 pages. Five of defendants' witnesses were experts in the field of psychiatry, five more were experts in the specialty of ophthalmology, four other witnesses testified with particular emphasis on the economic impact of the statute upon Blue Cross/Blue Shield, and one witness had been Executive Secretary of the Virginia State Board of Examiners in Optometry. This evidence addressed in cumulative detail all of the legal issues raised.

Except for another item of evidence which was excluded and which we shall presently address, the only evidence which defendants specify as having been omitted was testimony from certain unidentified "public witnesses" and facts to be developed by cross-examination of witnesses called by other parties of record. But as will be apparent from our discussion of the main issue in this case, we will

accept as true all statements of fact contained in defendants' proffered testimony as well as all reasonable inferences which logically flow therefrom. Thus in its present posture, there are no factual conflicts in the evidence. And, as the Commission observed, defendants' evidence, which was unimpeached and not attacked by cross-examination, could not have been in a stronger position. And, too, defendants could hardly expect to develop during cross-examination of hostile witnesses facts significantly more favorable on the issue presented than those already developed through their own witnesses. Consequently, we hold that, in view of the Commission's specialized internal procedure dealing with pre-filed testimony, the Commission did not err in deciding the constitutional issue on summary judgment under the circumstances of this case.

Another facet of defendants' procedural argument is that the Commission abused its discretion because it failed to address, and thus implicitly denied, a motion filed just before the February 1979 hearing. In the motion, defendants asked leave to present as evidence copies of certain portions of the transcripts of depositions and trial testimony of members of appellee Virginia Academy of Clinical Psychologists (VACP) given in an antitrust case recently tried in the United States District Court for the Eastern District of Virginia.[2] In the alternative, defendants moved for permission to depose certain members of VACP in the proceeding before the Commission. Defendants argue that without such proffered testimony before it, the Commission could not logically have determined there were no material facts genuinely in dispute or that defendants' evidence was insufficient on the constitutional issue. That argument must be rejected.

In the first place, the record on appeal fails to disclose that defendants made a proper proffer of the federal testimony. The record does not contain the content or purport of the excluded testimony so that we can determine the propriety of the Commission's action. *See Whittaker* v. *Commonwealth,* 217 Va. 966, 968-69, 234 S.E.2d 79, 81 (1977). Thus, we will not notice the alleged error.

---

[2] In that case, styled *Virginia Academy of Clinical Psychologists, and Robert J. Resnick, Ph.D.* v. *Blue Shield of Virginia, Blue Shield of Southwestern Virginia, and Neuropsychiatric Society of Virginia, Inc.,* the psychologists claimed the Blue Shield policy of refusing to pay for services rendered by clinical psychologists unless such services were billed through a physician violated Section 1 of the Sherman Act. 15 U.S.C. § 1. The district court decision in favor of Blue Shield, 469 F. Supp. 552 (E.D. Va. 1979), was affirmed in part and reversed in part on appeal by a panel of the Fourth Circuit. *Virginia Academy of Clinical Psychologists* v. *Blue Shield of Virginia,* 624 F.2d 476 (4th Cir. 1980).

As to denial of the motion for permission to depose, we think the motion was untimely. It was made two weeks after defendants' pre-filing deadline had passed and just five days before the scheduled hearing. The proceeding had been pending for many months and there had been ample time for defendants to prepare their case.

As we return to the main issue, certain undisputed and elementary principles relating to judicial review of legislative action should be examined.

▪ A presumption of validity attaches to every statute enacted into law by the General Assembly. *Coleman* v. *Pross,* 219 Va. 143, 246 S.E.2d 613 (1978). A reasonable doubt as to the constitutionality of a legislative enactment must be resolved in favor of its validity. The courts will declare the legislative judgment null and void only when the statute is plainly repugnant to some provision of the state or federal constitution. A judgment as to the wisdom and propriety of a statute is within the legislative prerogative. *Newport News* v. *Elizabeth City County,* 189 Va. 825, 831, 55 S.E.2d 56, 60 (1949).

▪ Here, the intervenors claim that the statute is a valid exercise of the police power of the Commonwealth. While the police power has no exact definition, it is a necessary and inherent attribute of the State; it includes the power to prescribe regulations to promote the health, peace, morals, education and good order of the people. *Mumpower* v. *Housing Authority,* 176 Va. 426, 439-40, 11 S.E.2d 732, 736-37 (1940). And the Constitution provides that "[t]he police power of the Commonwealth to regulate the affairs of corporations, the same as individuals, shall never be abridged." Va. Const. art IX, § 6.

▪ Even though the police power is elastic and expansive when necessary to meet existing conditions, "[t]he legislature may not under the guise of protecting the public interest arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations." *Bowman* v. *State Entomologist,* 128 Va. 351, 368, 105 S.E. 141, 147 (1920). Unless there is a limit to the valid exercise of the State's police power, legislatures would have unbounded power. *Etheredge* v. *Norfolk,* 148 Va. 795, 805, 139 S.E. 508, 511 (1927). In *Etheredge,* quoting the Supreme Court of the United States, we said:

> " 'In every case . . . the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual? . . . The mere asser-

tion that the subject relates though but in a remote degree to the public health does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate.' "
*Id.*

Recognizing they have the burden of overcoming the presumptive constitutionality of Code § 38.1-824, defendants contend the unrebutted evidence is more than sufficient to sustain the burden.

As we turn again to the defendants' evidence, we will accept as true all reasonable inferences that may be fairly drawn from the facts.[3]

Testimony from Blue Cross/Blue Shield's officials showed that in order for defendants to offer a full program of prepaid medical services, it is necessary to attract a large number of physicians who will participate as providers of medical services. When a physician agrees to participate, he enters into a participating physician's agreement not only promising to accept defendants' allowance as full payment for covered medical services rendered to subscribers but also agreeing to provide services to subscribers without compensation if defendants' fund for payment of the physician has been depleted. In addition, under Code § 38.1-814, *supra,* the physicians and hospitals are jointly and severally liable with the Plan for the Plan's debts.

The Plans incorporate a usual, customary and reasonable feature which is "geared basically to" the usual, customary and reasonable charge of a mass of physicians. Under this concept, approximately 90 percent of the participating physicians' charges are paid in full. The participating physician agrees not to bill the patient for the unpaid balance of his charges.

The evidence showed that the "medically necessary" requirement for payment of a claim is maintained for two reasons: to assure the financial soundness of the Plans and because it is in the best interests of public health. The latter reason is justified because, according to the testimony, physical and mental symptoms are "so interrelated" the provider must have an understanding of the entire body to render effective treatment.

Blue Cross/Blue Shield recognize a second category of provider,

---

[3] It should be remembered, however, that this evidence is accepted as true only for the limited purpose of testing the legality of the Commission's decision. Testimony, uncontradicted and unimpeached, tending to impugn the qualifications of certain licensed practitioners should be viewed in the light of the restricted purpose for which it is received.

the non-participating physician, whose services are covered by defendants on a voluntary basis.

According to defendants' testimony, the statute in question "creates a third category of non-physician providers and mandates reimbursement to these non-physician providers without any of the corresponding risks and responsibilities assumed by physician providers. Psychologists, optometrists and opticians accept none of the burdens and responsibilities that participating physicians accept under state law and under the participating physician agreement, but by statute are awarded all of the benefits enjoyed by participating and non-participating physicians." Because the statute imposes no requirement on these non-participating providers for physician supervision or billing, defendants have maintained such a requirement "to provide good quality, medically necessary health care, at affordable costs." According to defendants' chief executive officer: "The requirement of physician supervision ensures physician screening for physical problems and further ensures that the treatment is medically necessary and conforms to good medical standards. The physician billing requirement is the only practical way, with the high volume of claims we receive, that we can ensure there has been physician supervision. Most physicians consider the physician billing requirement to be an administrative headache, but we deem it critical to be sure we aren't paying for medically unnecessary services."

Defendants' evidence showed that compliance with the statute in question will adversely affect their ability to compete with commercial insurance companies because payment for unsupervised services of psychologists, optometrists and opticians which are not medically necessary will increase health-care costs and subscriber premium rates. Subscribers will be forced to seek commercial insurance coverage because they object to being forced to buy legislatively mandated non-physician insurance in order to obtain physician insurance. In addition, defendants' testimony expressed a fear that, if the statute is declared valid, other groups which contend they perform services the same as or similar to those performed by physicians will seek to be included under its provisions. They list, for example, audiologists, operating room technicians, physical therapists, pastoral counselors, acupuncturists, school psychologists, naturopaths, midwives, obesity clinics and inhalation clinics.[4]

---

[4] Effective July 1, 1979, after the hearing in this proceeding but before the written decision, the statute was amended to include the services of clinical social workers. The constitutional validity of that amendment is not directly involved here.

The ophthalmologists who testified for defendants discussed the medical aspects of eye examinations, pointing out that medical problems often cause poor vision. The evidence showed an optometrist is licensed to refract ("measurement of the focusing power of the eyes"), prescribe eyeglasses, fit contact lenses, prescribe muscle exercises, sell eyeglasses, and work with industry on industrial lighting. An optician may properly fabricate and dispense a pair of glasses, adjust them on the face and fit contact lenses. But optometrists and opticians, unlike ophthalmologists, are not qualified, the witnesses said, to give medical or surgical treatment or make medical and surgical judgments upon which such treatment is based. According to the testimony, optometrists, often thought of by the public as "eye doctors," receive training which is inferior to that given to an ophthalmologist and are thus not equipped to detect medical disease when performing examination procedures which an optometrist is licensed and qualified to perform. The testimony indicated, reciting specific case histories, that acute medical problems are often missed upon examination by optometrists, resulting in serious consequences which could have been avoided by prompt detection, diagnosis and treatment.

The evidence showed that inclusion of optometrists and opticians in prepaid medical programs like Blue Cross/Blue Shield will "inevitably" lead to more persons with eye disease being seen by optometrists, who are not qualified to diagnose and treat such diseases. Testimony showed that the statute "would be detrimental to the public health, safety and welfare. The reason is that it would further confuse, in the minds of laypersons, the nature of care and services they are receiving and would lead them to believe they are receiving medical care, when in fact, they are not."

The testimony aimed at the psychologists by defendants' witnesses was in a similar vein. Psychiatrists testified that all psychotherapy rendered by psychologists should be supervised by a physician. According to the evidence, psychotherapy is defined as "any sort of interpersonal contact that helps correct some anxiety or some distress or some pain in an individual who appeals for such advice." In order to be effective, however, "the individual giving that advice must also be completely cognizant of the biological aspects of what may be causing the anxiety or the distress or the pain or the dysfunction. So the psychotherapy can't simply be conversation, it's got to be backed by thorough knowledge of all the factors that can contribute to the various behavior disorders." Testimony indicated that even

Ph.D. clinical psychologists take only a few of the important medical courses necessary to adequately diagnose and treat nervous and mental disorders. Citing examples of public confusion over the qualifications of psychologists in the mental health area, the evidence showed that the law in issue here, called a "freedom of choice statute," poses a danger to the welfare of the public because "a psychologist is not competent to make a thorough diagnosis or give comprehensive therapy. There is always the possibility of a somatic complication which only a psychiatrist who is trained in medicine can diagnose or treat."

On appeal, as before the Commission, defendants assert the statute represents a special or private law in violation of Article IV, § 14(18) of the Virginia Constitution; a denial of equal protection of the laws in violation of the Fourteenth Amendment to the federal Constitution; a deprivation of property without due process of law in violation of the Fourteenth Amendment and Article I, § 11 of the Virginia Constitution; and an impairment of contract in violation of Article I, § 10 of the federal Constitution and Article I, § 11 of the Virginia Constitution. They argue the evidence establishes that the 1973 amendment "would give to psychologists, optometrists and opticians a special, preferred status over both participating and non-participating physicians. Such psychologists, optometrists and opticians would receive, by direction of the statute, all the benefits for which the participating physicians contract, plus further exclusive benefits; yet the favored non-physician providers would bear none of the obligations, liabilities or risks borne by the physicians. The statute thus discriminates against physicians—treating them unequally, taking their (and the participating hospitals') property and impairing their contracts. Further, the statute impairs the subscription contracts—in fact, virtually rewrites them—by forcing the subscribers to pay for services of non-physicians which may be medically unnecessary, in order to purchase medically necessary services of physicians."

But, as Blue Cross/Blue Shield concedes, under the circumstances of this case in order to prevail on any of their due process, equal protection and impairment of contract constitutional objections, they must prove that the 1973 amendment to Code § 38.1-824 was not enacted pursuant to a valid exercise of the Commonwealth's police power. This they have not done; the evidence fails to rebut the presumption of constitutionality.

A statute is a proper exercise of the police power if it is designed

to accomplish a legitimate public purpose and if the means employed have a real, substantial relation to such public object. *Bowman* v. *State Entomologist,* 128 Va. at 368, 105 S.E. at 147. *See Alford* v. *Newport News,* 220 Va. 584, 586, 260 S.E.2d 241, 243 (1979). Here, the subject of legislative attention is directly related to protection of the public health, a necessary, legitimate public purpose; the purpose is not, as defendants contend, to further the economic interests of non-physician licensed practitioners. To support this public objective, the General Assembly has authorized establishment of plans to provide prepaid medical services at reasonable costs for the general public. The focus is on *services* for medical care and the availability of such services. As a means to increase the accessibility of such services to the public, the legislature by the 1973 amendment has required defendants to recognize and pay for the *services* rendered by optometrists, opticians and psychologists, but only if the services are provided for by the contract and if the services are those which those providers are licensed to render in Virginia. Thus, as the Commission decided, the legislature has increased the availability of mental and eye care services to the public by permitting them to choose between the services of psychiatrists and psychologists, and ophthalmologists and opticians and optometrists. The method employed by the statute reasonably accomplishes its purpose and is rationally related to such public objective.

Defendants argue the classification made by the statute has no reasonable relationship to the purpose of the statute. Against a claim of unreasonable classification amounting to discrimination, the enactment in question must be upheld if any state of facts can be reasonably conceived that would support it. *Mandell* v. *Haddon,* 202 Va. 979, 989, 121 S.E.2d 516, 524 (1961). The Commission correctly identified several sets of facts which justify the statute: for example, as previously noted, the legislature may have wanted to enhance the availability of mental and eye care services by increasing the numbers of providers; the legislature could have desired to give subscribers greater freedom of choice in their selection among licensed providers of such services. In addition, as the intervenors point out, the legislature may have wanted to design the statute to reduce the cost of such services by increasing competition among providers.

Furthermore, we reject defendants' argument that the statute creates an unreasonable classification because participating physicians are treated differently in that non-physicians are guaranteed

reimbursement. As the Attorney General argues, there is no indication in the statute that the legislature intended to give preferred status to psychologists, optometrists or opticians. The statute does not require that those providers be given greater reimbursement than the amount paid participating or non-participating physicians. Optometrists, opticians and psychologists may seek payment from their patients for fees not covered by Blue Cross/Blue Shield, but non-participating physicians may do likewise. And the statute does not give those providers claims against Blue Cross/Blue Shield funds superior to the claims of physicians.

Defendants place great reliance on two cases, *Etheredge* v. *Norfolk, supra,* and *Ketcham* v. *King County Medical Service Corp.,* 81 Wash.2d 565, 502 P.2d 1197 (1972). *Etheredge* is distinguishable from the present case and we do not find *Ketcham,* a 4-3 decision, persuasive.

In *Etheredge,* the ordinance under attack required landlords to pay tenants' delinquent water bills. Against the city's contention that the ordinance was a valid health measure, this court found the purpose to be merely the collection of past due water bills, only remotely connected to the public health. 148 Va. at 808, 139 S.E. at 512. Here, the relation of Code § 38.1-824 to the public health is direct, not remote.

In *Ketcham,* the sharply divided Supreme Court of Washington decided a Washington statute similar to Code § 38.1-824 was invalid. The majority said the purpose of the law was for the economic benefit of optometrists. 81 Wash.2d at 569-70, 502 P.2d at 1200. We do not here choose to adopt such a conclusion. See *Maryland Medical Service, Inc.* v. *Carver,* 238 Md. 466, 209 A.2d 582 (1965), in which the court held that a Maryland statute, requiring reimbursement of Blue Shield subscribers for the services of chiropodists, was in the public interest and thus constitutionally valid.

And finally on the police power question, defendants offered substantial testimony that due to certain differences between the professional qualifications and skills of optometrists, opticians and psychologists, on one hand, and ophthalmologists and psychiatrists, on the other, enforcement of Code § 38.1-824 will be detrimental to the public health and safety. Thus, defendants say, the statute does not reasonably relate to its purpose to protect the public health. We reject this contention because such evidence merely relates to the wisdom of the legislature in enacting the statute, a consideration beyond the scope of judicial review of legislative judgment.

Actually, such evidence is a challenge to the statutes under which optometrists, opticians and psychologists are certificated and licensed. Those statutes are not in issue here and must be presumed to be a valid exercise of the police power. As the Attorney General argues, those statutes demonstrate the legislative judgment that the public health is enhanced by the practice of psychologists, optometrists and opticians unsupervised by physicians. Although a licensed non-physician does not offer the same kind of services as a licensed physician, it does not follow that such non-physician cannot "benefit" the public. Code § 38.1-824 merely makes more available to the public those services already determined to be advantageous to the public health and safety.

In sum, we hold the Commission correctly decided § 38.1-824 represents a valid exercise of the Commonwealth's police power as applied to optometrists, opticians and psychologists.

In conclusion, defendants argue that the Commission erred in denying their post-hearing motion for partial summary judgment. Blue Cross/Blue Shield point out that Code § 38.1-347.1 provides that commercial insurance companies may not deny coverage for services legally performed by licensed optometrists, opticians and psychologists. Thus, in this respect, § 38.1-347.1, applying to commercial insurers, is similar to § 38.1-824, applying to prepaid health services plans such as Blue Cross/Blue Shield. But, until a statutory change effective July 1, 1979 (see Acts 1979, ch. 13 at 19), Code § 38.1-360(3) (1978 Cum. Supp.) provided that group commercial insurance policies were exempt from the requirements of § 38.1-347.1, an exemption which predated the effective date of the 1973 amendment to § 38.1-824.

Blue Cross/Blue Shield note the evidence showed that 85 percent of their business is represented by group policies and that the percentage of the commercial insurers' group business is "significantly higher." Defendants thus argue that during the period beginning with the effective date of the 1973 amendment to § 38.1-824 through June 30, 1979, the three statutes, read together, placed Blue Cross/Blue Shield at a competitive disadvantage as compared to commercial insurers. Defendants contend the classification made by these statutes, collectively, promotes no legitimate state end and is both irrational and unreasonable. Accordingly, they say the statutes were "unconstitutional on their face as applied to Blue Cross/Blue Shield, in that they represented special legislation and deprived Blue Cross/Blue Shield of equal protection of the laws."

The intervenors contend the classification was reasonable. They argue that because of the many other statutory differences between Blue Cross/Blue Shield and commercial insurers, the distinction under consideration was justified. They point out defendants are tax exempt, Code § 38.1-828, have a geographic monopoly, Code § 38.1-822.1, and are not subject to detailed regulation of investment policy, reserve requirements and financial reporting as are commercial insurers. *See* Code §§ 38.1-159 to -217. Intervenors contend that all of these distinctions "add up to a significant competitive advantage which has enabled Blue Cross/Blue Shield to achieve a dominant position in the health insurance field in this state." Urging there is a conceivable justification for the classification, *Mandell* v. *Haddon, supra,* intervenors say the General Assembly may well have thought that in exchange for the special benefits, Blue Cross/Blue Shield should be required to assume additional responsibility by providing its subscribers freedom of choice among qualified practitioners, encouraging competition. They say these justifications satisfy the "conceivable justification" requirement for constitutionality. We do not agree.

We find no conceivable justification for requiring only one insurer to cover the services of psychologists, optometrists and opticians. The statutory distinctions highlighted by the intervenors are mere regulatory measures imposing differing requirements on the respective insurers in the public interest. Such regulation, however, does not justify the discrimination created by the several statutes in issue which has no rational relationship to the purpose for which it is made.

Consequently, we hold that the combined effect of Code §§ 38.1-347.1, -360, and -824 made the statutes unconstitutional as applied to Blue Cross/Blue Shield during the six-year period in question. Thus, the Commission erred in denying defendants' motion for partial summary judgment.

For all of the foregoing reasons, the orders appealed from will be affirmed in part, reversed in part and the case will be remanded for such further proceedings, if any, as may be necessary, not inconsistent with the views expressed in this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*