COURT OF APPEALS OF VIRGINIA


Present:  Judges McClanahan, Petty and Powell
Argued at Richmond, Virginia


MIRANT POTOMAC RIVER, LLC

                                                MEMORANDUM OPINION[*] BY
v.       Record No. 2067-08-2                   JUDGE WILLIAM G. PETTY
                                                     JUNE 23, 2009
COMMONWEALTH OF VIRGINIA,
 STATE AIR POLLUTION CONTROL BOARD


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            T. J. Markow, Judge

        Timothy G. Hayes (Kevin J. Finto; Andrea W. Wortzel; Miranda R. Balister;
        Hunton & Williams, LLP, on briefs), for appellant.

        Carl Josephson, Senior Assistant Attorney General (Robert F. McDonnell,
        Attorney General; Roger L. Chaffe, Senior Assistant Attorney General,
        on brief), for appellee.


        Pursuant to Code § 2.2-4026, Mirant Potomac River, LLC ("Mirant") challenged the

validity of the State Air Pollution Control Board's (the "Board") regulation, published at 9

VAC § 5-140-1061.  On July 30, 2008 the Circuit Court for the City of Richmond dismissed

Mirant's petition.  On appeal, Mirant argues that the trial court erred in finding (1) that 9 VAC

§ 5-140-1061 complied with the statutory authority granted to the Board, (2) that there was

substantial evidence to support the Board's decision to adopt the regulation, and (3) that the

regulation was not an unlawful taking of Mirant's property.  For the reasons that follow, we

conclude that the Board exceeded its statutory authority by adopting the regulation at issue.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Therefore, we reverse the trial court's ruling and remand to the circuit court with instructions to vacate the regulation and remand to the Board to conduct further proceedings consistent with the statute. See Harrison v. Ocean View Fishing Pier, LLC, 50 Va. App. 556, 576, 651 S.E.2d 421, 431 (2007) (reversing and remanding to the circuit court to remand the case to the Alcoholic Beverage Control Board with instructions to conduct further proceedings in accordance with the law). Because we reverse the trial court's ruling and remand with instructions to vacate the regulation, we do not address Mirant's last two questions presented.

I.  STATUTORY AND REGULATORY SCHEME

A.  National Legislation and Regulations

Since 1955, our federal government has formally recognized the danger of pollution and its negative effects on our atmosphere.[1]  Pub. L. 84-159, ch. 360, 69 Stat. 322.  Subsequently, Congress has taken on the task of reducing airborne contaminants that cause pollution by regulating the amount of emissions each state is permitted to release into the atmosphere.[2] However, in doing so, Congress left the "primary responsibility for assuring air quality within the entire geographic area comprising such state" up to the affected states.  42 U.S.C. §§ 7407(a) & 7401(a)(3) (stating in its Congressional findings that "air pollution prevention . . . and air

---

[1] Initially, Congress enacted the Air Pollution Control Act in 1955, the Clean Air Act of 1963, and the Air Quality Act of 1967, which did not require any emissions reductions.  Then, Congress enacted the Clean Air Act Extension in 1970, and the Clean Air Act Amendments in 1977 and 1990, which required substantial emissions reductions.

[2] "The Clean Air Act . . . is a comprehensive program for controlling and improving the nation's air quality.  Under the [Clean Air Act], the EPA identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and promulgates those determinations as national ambient air quality standards . . . ."  1000 Friends of Maryland v. Browner, 265 F.3d 216, 220 (4th Cir. 2001) (internal citations omitted).

pollution control at its source is the primary responsibility of States and local governments"); see also 1000 Friends of Maryland v. Browner, 265 F.3d 216, 220 (4th Cir. 2001) (stating that "[e]ach state bears responsibility for ensuring that its ambient air meets the appropriate [standards]").

Nonetheless, Congress found that "[f]ederal . . . leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(4). In furtherance of those findings, Title I of the Clean Air Act (the "Act") requires the Environmental Protection Agency ("EPA") to list air pollutants that contribute to air pollution, 42 U.S.C. § 7408, and set National Primary and Secondary Ambient Air Quality Standards ("standards") that the states are required to attain, 42 U.S.C. § 7409. Further, the EPA must divide the country into "air quality control regions" and designate those regions as "nonattainment," "attainment," or "unclassifiable" depending on whether each specific pollutant satisfies those standards. 42 U.S.C. § 7407.

A "nonattainment area" is described as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7407(d)(1)(A)(i). By contrast, an "attainment area" is described as "any area . . . that meets the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7407(d)(1)(A)(ii).

For areas designated as nonattainment areas, Congress requires states to reduce the emissions that do not comply with the relevant standards. In providing for the overall reduction in emissions in the most cost-efficient manner, Congress authorized the EPA to establish a cap and trade system.[3] 42 U.S.C. § 7651. Under this system, each affected electric generating unit

---

[3] The intent of Title IV of the Clean Air Act was "to effectuate [sulfur dioxide and nitrogen oxide] reductions by requiring compliance by affected sources with prescribed emission limitations by specified deadlines, which limitations may be met through alternative methods of

("unit") is allocated a maximum allowance of emissions that it is permitted to release into the atmosphere. 70 Fed. Reg. 25349-25350. The system further allows an owner or operator of an affected unit to transfer any allowances that it does not use because of reduced emissions to another owner or operator of an affected source that might exceed the amount of allowable emissions. 42 U.S.C. § 7671f. In following that statutory directive, the EPA developed the Clean Air Interstate Rule ("CAIR") in 2005.[4] 70 Fed. Reg. 25162.

CAIR regulates the nitrogen oxide and sulfur dioxide emissions in order to reduce the degree of particulate matter and ozone pollution in the atmosphere. Id. at 25167. Each state is allocated an annual budget that limits overall emissions permitted within the geographical boundaries of that state. Id. at 25165, see also Code § 10.1-1328(A) (stating the collective budget for all sources located within the Commonwealth of Virginia). Then, each state divides the budget and allocates a certain number of emissions allowances to each unit that produces the prescribed pollutants. Id.

The allocation to each unit occurs through the permit program established by the state and approved by the EPA, 42 U.S.C. § 7661a, which requires each source to submit a permit application accompanied by a compliance plan, 42 U.S.C. § 7661b.[5] The permit specifies

---

compliance provided by an emission allocation and transfer system." 42 U.S.C. § 7651. Section 401 of Public Law 101–549 (104 Stat. 2584) added a second Title IV without repealing the existing Title IV. Therefore, there are two Title IV's. Here, we are referring to Title IV with the heading "Acid Deposition Control."

[4] CAIR was vacated in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008), because it did not require a determination of a state's "significant contribution" to downwind nonattainment areas in other states under 42 U.S.C. § 7410(a)(2)(D)(i)(I). However, in a subsequent petition filed by the EPA, the court granted the EPA's petition for the court to remand without vacatur to the EPA to amend the rule consistent with the court's opinion. Thus, the rule is currently still in effect for all intents and purposes until the EPA changes it to comply with the court's directions.

[5]     A single application is required identifying each emission unit
        subject to this article. The application shall be submitted
        according to the requirements of this section, 9 [VAC §] 5-80-90

- 4 -

enforceable emission limitations and standards and a schedule of compliance specific to a particular source.  42 U.S.C. § 7661c; 9 VAC § 5-80-110.

## B.  Virginia's Legislation and Regulations

After Congress enacted the Air Pollution Control Act of 1955 and the Clean Air Act of 1963, our General Assembly created the Virginia Air Pollution Control Board in 1966 to formulate regulations directed at achieving and maintaining air quality standards.  1966 Acts, c. 497, Code §§ 10-17.11, 10-17.16, and 10-17.18.

In 1994, our General Assembly implemented a cap and trade system permitted by Congress.  See Code § 10.1-1322.3.  Code § 10.1-1322.3 is the statute that provided a mechanism for the Virginia Air Pollution Control Board to adopt a program that permits the trading of allowances:

> In accordance with § 10.1-1308, the Board *may* promulgate regulations to provide for emissions trading programs to achieve and maintain the National Ambient Air Quality Standards established by the United States Environmental Protection Agency, under the federal Clean Air Act.
>
> \*        \*        \*        \*        \*        \*        \*
>
> *No regulations shall prohibit the direct trading of air emissions credits or allowances between private industries, provided such trades do not adversely impact air quality in Virginia.*

Code § 10.1-1322.3 (emphasis added).

---

and procedures approved by the board.  Where several units are included in one stationary source, a single application covering all units in the source shall be submitted.  A separate application is required for each stationary source subject to this article.

9 VAC § 5-80-80.

Generally, under the Board's regulations, a source[6] located within an attainment area is permitted to participate fully in the cap and trade program. 9 VAC § 5-140-1060.[7] The source may combine its original allowances with additional allowances obtained from other sources to demonstrate compliance with the applicable standards.[8] Id. Thus, if the source is located in an attainment area, the source's actual nitrogen oxide emissions are not limited to the amount of allowances it is initially allocated, but may also include the allowances it acquires from another source.

In 2006 our General Assembly enacted Code § 10.1-1328 which requires the Virginia Air Pollution Control Board to promulgate regulations permitting the allocation of allowances to electric generating units for nitrogen oxide and sulfur dioxide. The statute begins by setting the general emissions allowances allocated to the state for the control period in question. Code § 10.1-1328(A)(1) through (4). Then, subsection (A)(5) requires that the regulations

> provide for participation in the EPA-administered cap and trade
> system for [nitrogen oxide] and [sulfur dioxide] to the *fullest extent
> permitted by federal law* except that the Board may prohibit
> electric generating facilities *located within a nonattainment area* in

---

[6] A CAIR nitrogen oxide source is defined as any source that has one or more CAIR nitrogen oxide units, which are defined as "any stationary, fossil-fuel-fired boiler or stationary, fossil-fuel-fired combustion turbine serving at any time, since the later of November 15, 1990, or the start-up of the unit's combustion chamber, a generator with nameplate capacity of more than 25 [megawatt electrical] producing electricity for sale." 9 VAC § 5-140-1040(A)(1).

[7] The State Air Pollution Control Board enacted 9 VAC § 5-140-1060 on the authority granted to it by Code §§ 10.1-1308 and 10.1-1322.3, and 42 U.S.C. §§ 7408, 7409, 7410, and 7602. The purpose of 9 VAC § 5-140-1060 was to establish general emissions standards for nitrogen oxides emitted in an attainment area.

[8] The "owners and operators of each CAIR [nitrogen oxide] source and each CAIR [nitrogen oxide] unit at the source" must retain nitrogen oxide allowances "in an amount not less than the tons of total nitrogen oxides emissions for the control period from all [nitrogen oxide] units at the source . . . ." 9 VAC § 5-140-1060(C)(1). One CAIR nitrogen oxide allowance "is a limited authorization to emit one ton of nitrogen oxides" into the air. 9 VAC § 5-140-1060(C)(5). The allowance cannot be applied to a control period that occurred before the calendar year in which the allowance was allocated. 9 VAC § 5-140-1060(C)(3).

> the Commonwealth from meeting their [nitrogen oxide] and [sulfur dioxide] compliance obligations through the *purchase* of allowances from in-state or out-of-state facilities.

Code § 10.1-1328(A)(5) (emphasis added).

Subsequently, the Board drafted regulations attempting to implement this code section. Those regulations were open to public notice and comment. On October 10, 2007, the Board adopted Regulation 9 VAC § 5-140-1061.[9] The relevant portion of the regulation reads, in pertinent part, as follows:

> No owner, operator or other person shall cause or permit to be discharged into the atmosphere from any . . . unit any [nitrogen oxide] emissions in excess of the [*nitrogen oxide*] *annual emissions cap*. For each control period, the [nitrogen oxide] annual emissions cap shall be equal to the number of [nitrogen oxide] allowances (expressed in tons) *allocated for the CAIR [nitrogen oxide] unit for the control period in accordance with 9 [VAC §] 5-140-1420*.

9 VAC § 5-140-1061(A)(1).

Thus, to determine compliance of a facility located in a nonattainment area, the Board deducts the unit's actual nitrogen oxide emissions in tons from the nitrogen oxide annual emissions cap—that is, the number of allowances *initially* allocated to the unit by the permitting authority. The regulation does not specifically state that compliance is limited to the amount of nitrogen oxide emissions allowances *initially* allocated to it; however, the regulations define the term allocate in the following way:

> "Allocate" or "allocation" means, with regard to CAIR NO$_X$ allowances, the determination by a permitting authority or the administrator of the amount of such CAIR NO$_X$ allowances to be *initially* credited to a CAIR NO$_X$ unit, a new unit set-aside, a new energy efficiency/renewable energy unit set-aside, or other entity.

---

[9] 9 VAC § 5-140-1061 was adopted pursuant to the authority granted by Code §§ 10.1-1308 and 10.1-1328, and 42 U.S.C. §§ 7408, 7409, 7410, and 7602.

9 VAC § 5-140-1020 (emphasis added).  Thus, the regulation effectively prohibits a unit or facility located in a nonattainment area from acquiring additional allowances by any means from any other facility in order to cover emissions above the level initially established by the Board.

## II.  ANALYSIS

Mirant owns several power plants in the Washington, D.C. metropolitan area including the Potomac River Generating Station ("Potomac River plant") located in Alexandria, which Mirant concedes is subject to regulation under the federal Clean Air Act and the State Air Pollution Control laws and regulations.  Mirant also owns an electric generating unit in Maryland at which it has reduced its nitrogen oxide emissions below the levels required by the EPA.  Because of this reduction, Mirant's Maryland plant has surplus emission allowances.  However, according to Mirant's public comment on the Board's proposed regulation, installing pollution reduction equipment at the Potomac River plant is not feasible.  Thus, the Potomac River plant is unable to comply with the nitrogen oxide annual emissions cap established by the Board.

Mirant complains that the regulation at issue limits its nitrogen oxide emissions compliance options at its Potomac River plant to the emission allowances initially allocated to it and does not allow for the transfer of allowances from other sources owned by Mirant.  Mirant argues that the statute granting the Board the authority to promulgate this regulation—Code § 10.1-1328(A)(5)—requires the Board to allow participation in the federal emission cap and trade system to the fullest extent permitted by federal law.  It further argues that the only authority the Board has to limit this participation is to prohibit the use of *purchased* allowances for purposes of state compliance.  Thus, Mirant concludes that the regulation is more restrictive than the statute allows and thus *ultra vires*—beyond the scope of authority granted by the General Assembly.

- 8 -

The Board disagrees and contends that the word "purchase" in Code § 10.1-1328(A)(5) is inclusive of all types of transfers and exchanges and that the General Assembly intended to allow the Board to prohibit a power unit in a nonattainment area from acquiring any additional pollution allowances. That interpretation, according to the Board, is consistent with the definition of the term in the Uniform Commercial Code. In Code § 8.1A-201(b)(29) the General Assembly defined the word purchase as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." Further, the Board argues that the General Assembly's use of the word "purchase" in subdivision (D)(3) and (F) of Code § 10.1-1328 indicates that the word includes the sale, transfer, exchange, and any other voluntary disposition. We disagree with the Board and conclude that the regulation exceeds the scope of its authorizing statute because the term "purchase" is unambiguous and has a limited meaning that does not include all transfers of allowances.

## A. Standard of Review

"On review, the interpretation which an administrative agency gives its [law] must be accorded great deference." Jackson v. Marshall, 19 Va. App. 628, 633-34, 454 S.E.2d 23, 26 (1995) (internal quotation marks and citations omitted). However, when the question before us is solely a matter of statutory interpretation and whether the administrative agency's regulation complies with that statute, we will not afford such deference to the agency. Id. at 634, 454 S.E.2d at 26 (stating that "[c]ourts must construe and determine compliance with the statutes governing adoption of administrative regulation irrespective of the agency's construction, and not merely rubber-stamp an agency determination. Agency action, even when supported by substantial evidence, must be set aside if judicial review reveals a failure . . . to comply with statutory authority." (internal quotation marks and citations omitted)). Indeed, "[w]hen the

- 9 -

legislature delegates authority to an administrative agency to promulgate regulations, those regulations must neither exceed the scope of the authority delegated nor be inconsistent with it." Avalon Assisted Living Facilities v. Zager, 39 Va. App. 484, 508, 574 S.E.2d 298, 309 (2002). Thus, a question of statutory interpretation and regulatory compliance with statutory authority involves a pure question of law, and, therefore, on appeal, we review it *de novo*. Va. Cellular v. Va. Dept. of Taxation, 276 Va. 486, 490, 666 S.E.2d 374, 376 (2008) (citing Ainslie v. Inman, 265 Va. 347, 352, 577 S.E.2d 246, 248 (2003)).

### B. Defining the Term "Purchase"

We start with the proposition that when the General Assembly enacted Code § 10.1-1328, it established the statewide emissions limitations and charged the Board with the responsibility of promulgating regulations that provide "for participation in the EPA-administered cap and trade system . . . to the *fullest extent permitted by federal law . . . .*" Code § 10.1-1328(A)(5) (emphasis added). As we have detailed *supra*, the federal law permits, without restriction, the transfer of allowances between affected sources to achieve an efficient and cost effective method of reducing the overall emission of pollutants into the atmosphere. 42 U.S.C. § 7671f. Thus, any limitation on a transfer otherwise permitted by federal law must be specifically set out in the statute.

Our General Assembly enacted one exception to that general rule: "the Board may prohibit . . . facilities located within a nonattainment area . . . from meeting their [nitrogen oxide] and [sulfur dioxide] compliance obligations through the *purchase* of allowances from in-state or out-of-state facilities." Code § 10.1-1328(A)(5) (emphasis added).

While the statute only authorizes the Board to prohibit a facility's compliance through the "*purchase*" of allowances, the regulation prohibits *any transfer or exchange* of emission allowances for the purposes of demonstrating compliance. If the term "purchase" includes all

transfers—a position argued by the Board—then the regulation complies with its statutory authority; however, if the term "purchase" does not include all transfers—a position argued by Mirant—then the regulation exceeds the scope of its authorizing statute and it is invalid. Therefore, to determine whether the regulation exceeds its statutory authority, we must define the word "purchase."

"In interpreting the words in a statute, we presume that the General Assembly acted with full knowledge of the law in the area in which it dealt." Philip Morris v. The Chesapeake Bay Found., 273 Va. 564, 576, 643 S.E.2d 219, 225 (2007) (citing United Masonry, Inc. v. Riggs Nat'l Bank, 233 Va. 476, 480, 357 S.E.2d 509, 512 (1987)). While we endeavor to discern the "'true intent of the legislature, and adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature,'" Tyszcenko v. Donatelli, 53 Va. App. 209, 216, 670 S.E.2d 49, 53 (2008) (quoting Colbert v. Commonwealth, 47 Va. App. 390, 394, 624 S.E.2d 108, 110 (2006)), we typically rely solely on the words used in the statute to evidence that intent, Va. Cellular, 276 Va. at 490, 666 S.E.2d at 376. "In determining that intent, words are to be given their ordinary meaning, unless it is apparent that the legislative intent is otherwise." Phelps v. Commonwealth, 275 Va. 139, 142, 654 S.E.2d 926, 927 (2008). Therefore, we will apply the plain language of Code § 10.1-1328(A)(5) "unless the terms are ambiguous or applying the plain language would lead to an absurdity." Id.

We have previously held that the term "purchase" is unambiguous. Gen. Trading Corp. v. Motor Vehicle Dealer Bd., 28 Va. App. 264, 269, 503 S.E.2d 809, 812 (1998). In General Trading Corp., we stated that the term "purchase" is ordinarily defined as "'the acquiring of title to or property in anything for a price.'" Id. at 268, 503 S.E.2d at 811-12 (quoting Webster's Third New Int'l Dictionary 1844-45 (1981)). The term also denotes in legal phraseology "the act

- 11 -

or an instance of buying." Black's Law Dictionary 1248 (7th ed. 1999) (the definition for the term "buy" in Black's seventh edition refers back to the word "purchase"). The term "buy" is ordinarily defined as "to get possession or ownership of by giving or agreeing to give money in exchange . . . ." Webster's, supra, at 306. The prior two editions of Black's Law Dictionary reinforce the ordinary and legal definitions by defining the term as the "[t]ransmission of property from one person to another by voluntary act and agreement, founded on a valuable consideration." Black's Law Dictionary 1234 (6th ed. 1990); see also Black's Law Dictionary 1110 (5th ed. 1979) (providing the same definition as the sixth edition). Thus, both Webster's and Black's suggest that the term "purchase" *requires* some sort of consideration in exchange for the thing purchased.

By contrast, the term "transfer" is defined as:

> 1. Any mode of disposing of or parting with an asset or an interest in an asset, including a *gift*, the payment of money, release, lease, or creation of a lien or encumbrance. The term includes every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity redemption.
>
>      *     *     *     *     *     *     *
>
> 3. The conveyance of property or title from one person to another.

Black's Law Dictionary 1503 (8th ed. 2004) (emphasis added). Similarly, the term "transfer" is ordinarily defined as "the conveyance of right, title, or interest in either real or personal property from on person to another by sale, gift, or other process." Webster's, supra, at 2427. Clearly, then, the term "transfer" includes a purchase, gift, or any other method in which a right, title, or interest in some thing is conveyed from one person to another.

The two terms, when compared, are distinct in that the term "transfer" does not *require* the exchange of some *bona fide* consideration, but the term "purchase" does. Thus, the term

- 12 -

"purchase" is merely a subset of the term "transfer." In other words, all purchases include a transfer, but not all transfers include a purchase. It is evident, then, that if we accept the ordinary meaning of the term "purchase" the legislative intent was not to prohibit all transfers, but to prohibit the acquisition of emission allowances for a price or some other *bona fide* consideration.

The Board, however, asks us to adopt the definition of "purchase" found in Code § 8.1A-201(b)(29). That definition includes a "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." Clearly, this definition is much more expansive and inclusive than the ordinary meaning of the term "purchase." However, it is also clear that this definition only applies to transactions governed by the Uniform Commercial Code as adopted in the Code of Virginia. Code § 8.1A-102 (stating that Title 8.1A "applies to a transaction to the extent that it is governed by another title of the Uniform Commercial Code"). The various transactions governed by the Uniform Commercial Code include sales of goods, leases, negotiable instruments, bank deposits and collections, funds transfers, letters of credit, bulk sales, warehouse receipts, bills of lading, and other documents of title, investment securities, and secured transactions. See Title 8.2 through 8.9A of the Code of Virginia. The General Assembly's express mandate to allow "participation in the EPA-administered cap and trade system . . . to the fullest extent permitted by federal law" is not a transaction governed by any Title in the Uniform Commercial Code. Rather, it is governed by Chapter 13 of Title 10.1 of the Code of Virginia, as amended.

That notwithstanding, the Board argues that we should adopt this expansive definition of the term "purchase" and apply it to Code § 10.1-1328. In other code sections, the General Assembly has expressly imported definitions from Code § 8.1A-201. Code § 55-70.1 (adopting the definition of the word conspicuous by adding a parenthetical after the word and stating "as

- 13 -

defined by subdivision (10) of § 8.1A-201"); Code § 55-248.44:1(E) (providing that the term

"security interest," for the purposes of this code section, "shall have the same meaning as the

term is defined in § 8.1A-201"); Code § 59.1-494 (adopting the definition of the word "holder"

by setting off the phrase "as defined in § 8.1A-201(21)" using commas immediately after the

word "holder"); Code § 59.1-501.2 (incorporating definitions of words defined in other titles by

stating "[t]he following definitions in other titles apply to this chapter" and including

(1) "Burden of establishing" § 8.1A-201 and (2) "Document of title" § 8.1A-201).[10] From these

examples, we conclude that, had the General Assembly intended the Code § 8.1A-201 definition

of the term "purchase" to apply to its use in Code § 10.1-1328(A)(5), it would have simply said

so. The fact that the General Assembly did not follow any of these examples indicates that it

intended that the plain and ordinary meaning of the term "purchase" ought to define it.

The Board also argues that the language in the state-specific mercury emission reduction

program in Code § 10.1-1328(D)(3) and (F) supports its position. Essentially, the Board

contends that it is apparent that the legislature did not intend for the plain and ordinary meaning

of the term "purchase" to apply. Rather, the Board claims that the context of Code

§ 10.1-1328(D)(3) and (F) requires us to interpret the term "purchase" to include all transfers

regardless of whether consideration is given.

---

[10] While we could look to other code sections located in other Titles of the Code of
Virginia to define undefined terms in a different Title, we recognize that the underlying purpose
of looking to other code sections for definitions is to "view the entire body of legislation and the
statutory scheme to determine the 'true intention of each part.'" McCray v. Commonwealth, 37
Va. App. 202, 204-05, 556 S.E.2d 50, 51 (2001) (In a criminal prosecution for a violation of
Code § 18.2-93, the court looked "to other sections of the Code," specifically to different
provisions of the Uniform Commercial Code, "to determine the legislative intent when using the
term, 'banking house'"). But when a word is defined differently than its plain meaning in one
statutory scheme, adopting that specialized definition in a different statutory scheme is
inconsistent with the purpose of determining the true intent of the legislature for this statutory
scheme. Thus, we decline to incorporate the Uniform Commercial Code definition of purchase
to the nitrogen oxide and sulfur dioxide cap and trade system.

In Code § 10.1-1328(D)(3), regarding the state-specific mercury rule, the General Assembly stated that: "[t]he owners subject to the state-specific rule shall not be permitted to *purchase* allowances to demonstrate compliance with the regulations the Board adopts to implement this subsection. This prohibition does not include the *transfer* of credits authorized by subdivision 2." (Emphasis added). The Board argues that because the General Assembly thought it necessary to qualify the purchase restriction by exempting certain transfers from the prohibition on purchases, the term "purchase" must include all voluntary trades, transfers, and exchanges made with or without consideration. "Otherwise, there would be no need to so qualify the word 'purchase' in this instance as excluding such transfers."

We note initially, however, that this purchase limitation only applies to the state specific mercury rule and does not apply to the Clean Air Mercury Rule, which was adopted without limitation in Code § 10.1-1328(C). The state-specific rule in the mercury context does not require participation in the federal Clean Air Mercury Rule (CAMR) "to the fullest extent permitted by federal law . . . ." Code § 10.1-1328(A)(5). Rather, the mercury rules in subdivision (D) are different from the CAMR and unmistakably state-specific. Code § 10.1-1328(D). Moreover, the qualifying sentence—referring to transfers permitted by subdivision (D)(2)—does not actually refer to transfers as they are understood by the federal cap and trade program.

The state specific mercury rule is different than CAMR in several respects. First, subdivision (D)(1) of the state specific mercury rule allows compliance demonstration by an owner of one or more units located in the Commonwealth in the *aggregate*. Thus, if one unit exceeds its allocated allowances, but another unit does not, the owner does not violate the statute if the aggregate emissions are less than the aggregate allowances. No transfer is required. Second, the "transfers" that the Board argues are exempt from the purchase restriction in (D)(3)

- 15 -

are not transfers at all; instead, the statute allows for aggregate compliance—a concept that is distinct from the cap and trade scheme previously discussed—with commonly owned facilities located in close geographic proximity to the Commonwealth. Specifically, subdivision (D)(2) simply permits an owner of several units located within the Commonwealth

> to *satisfy its compliance obligations* under the state-specific rule through the *surrender of CAMR allowances* that meet the following requirements: [1] the allowances to be used are allocated to a facility under the control of the same owner or operator or under common control by the same parent corporation; [2] the allowances used are generated and capable of being lawfully traded under the CAMR; and [3] the surplus allowances are generated through the installation of emission controls at a facility located a straight line distance from the border of the Commonwealth of less than or equal to 200 km.

Code § 10.1-1328(D)(2) (emphasis added). Thus, the affected units or sources are not transferring allowances at all. Instead, an owner of one or more units can surrender allowances initially allocated to one unit on behalf of another unit if those allowances satisfy the three requirements of subdivision (D)(2). Even though the allowances must be "capable of being lawfully traded under the CAMR," there is no actual transfer. Rather, subdivision (D)(2) only allows the owner of multiple units to surrender its surplus allowances to the Board for compliance purposes. Because subdivision (D)(2) does not permit transfers like those permitted under the federal cap and trade system, we find the Board's argument—that all "transfers" are included in the term "purchase"—unpersuasive.

The Board also contends that the use of the term "purchase" in subdivision (F) indicates that it includes all transfers. Subdivision (F) provides that:

> [t]o further protect Virginia's environment, the Board shall prohibit any electric generating facility located within a nonattainment area from meeting its mercury compliance obligations through the *purchase* of allowances from another facility, except that such facilities shall be able to demonstrate compliance with allowances allocated to another facility that is under the control of the same owner or operator or under common

- 16 -

> control by the same parent corporation and is located within 200
> km of Virginia's border.

Code 10.1-1328(F) (emphasis added). However, we note that, like subdivision (D)(3), the exception language in subdivision (F) does not permit transfers of mercury allowances at all. Indeed, the exception language does not include the term "transfer." Rather, the exception language simply permits a facility located in a nonattainment area to demonstrate compliance with allowances allocated to another facility under common control or ownership that is located within 200 kilometers of Virginia's border. Therefore, again, we find the Board's argument unpersuasive.

## C. Public Policy Considerations

The Board further argues that allowing a company with several plants to acquire allowances by purchase at facilities in another state and then transfer those allowances to a facility in the nonattainment area in the Commonwealth is against the public policy and the purposes of the statute. The Board contends that this result would subvert the entire purpose that (A)(5) is intended to serve. In support, the Board quotes the trial court's hypothetical statement that "'[i]f sister companies are allowed to swap allowance overages free of charge, then there is nothing to prohibit a Maryland company subject to Maryland's statues [sic] and regulations from purchasing allowances from an outside company and giving them free of charge to her sister company in Virginia.'" The Board also argues, from the public health perspective, that the nonattainment regulation at issue, which prohibits intra-company transfers, "protect[s] the health of Virginia citizens and contribute[s] to attainment of air quality standards in Virginia." However, the Board does not have the general power to legislate on all matters affecting the "health, peace, morals, education and good order of the people" of the Commonwealth of Virginia. Blue Cross v. Commonwealth, 221 Va. 349, 358, 269 S.E.2d 827, 833 (1980) (citing Mumpower v. Housing Authority, 176 Va. 426, 439-40, 11 S.E.2d 732, 736-37 (1940)). Rather,

- 17 -

the Board's conduct is limited to the promulgation of regulations delegated to it by the General Assembly, which is a legislative function, and the enforcement of the same, which is an executive function.  See Ames v. Town of Painter, 239 Va. 343, 349, 389 S.E.2d 702, 705 (1990) (stating that a reviewing court's inquiry is "whether [the agency] has acted in accordance with the policies and standards specified in the legislative delegation of power").

Finally, the Board argues that allowances are valuable and thus a transfer from one facility to another would constitute either a debit or a credit to the overall net worth of each facility.  In other words, it argues, "transfers can be treated similarly to 'purchases' by facilities." However, that factual issue is not before us.[11]  The only question before us is whether 9 VAC § 5-140-1061 exceeds the scope of Code § 10.1-1328(A)(5).  Without a factual record, we are not in a position to determine whether Mirant's proposed transaction would constitute a purchase as that term is used in the statute, and we decline to do so.

### III.  CONCLUSION

Therefore, we hold that the only limitation to the federal cap and trade system that is authorized by Code § 10.1-1328(A)(5) is the prohibition, in a nonattainment area, of compliance with pollution limits through the purchase of emission allowances—that is in exchange for some *bona fide* consideration.  That being the case, the Board's regulation prohibiting compliance through *any* acquisition of allowances exceeds the scope of its authority under Code § 10.1-1328(A)(5).  Therefore, we conclude that because the Board was not authorized to

---

[11] In reviewing this issue *de novo*, we note that this appeal comes from the circuit court's hearing pursuant to Code § 2.2-4026, which entitles a party who is "affected by and claiming the unlawfulness of any regulation" to "direct review" of the lawfulness (or unlawfulness) of that regulation by a "court of competent jurisdiction" that is "subject to appeal to or review by higher courts."  In this type of appeal, we determine the lawfulness (or unlawfulness) of the Board's regulation by viewing the regulation and its authorizing statute in the abstract—that is, without regard to the circumstances surrounding the effect on Mirant.

promulgate 9 VAC § 5-140-1061 in its current form, it is invalid.  For the foregoing reasons, we reverse and remand to the circuit court with instructions to remand this case to the State Air Pollution Control Board with instructions to amend 9 VAC § 5-140-1061 so that it complies with Code § 10.1-1328(A)(5).

<u>Reversed and remanded.</u>